WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Adela V. Villarreal,

                Plaintiff,

v.

Carolyn W. Colvin,

                Defendant.

No. CV-14-02399-TUC-RM (EJM)

**REPORT AND
RECOMMENDATION**

Plaintiff Adela V. Villarreal ("Villarreal") brought this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of Social Security ("Commissioner"). Villarreal raises six issues on appeal: 1) whether the Administrative Law Judge ("ALJ") erred by rejecting the treating physician and psychologist opinions and failing to read their medical records, 2) whether the ALJ failed to incorporate all of Villarreal's limitations in the residual functional capacity ("RFC") assessment, 3) whether the ALJ erred in her Step Four determination when she failed to inquire whether the Vocational Expert's ("VE") testimony was consistent with the Directory of Occupational Titles ("DOT"), erroneously classified limited work activity as past relevant work ("PRW"), and mischaracterized Villarreal's job duties, 4) whether the ALJ committed error in failing to make a Step Five finding regarding ability to do other relevant work, 5) whether the ALJ failed to provide clear and convincing reasons to reject Villarreal's subjective symptom testimony and misconstrued the lay witness testimony,

1  and 6) whether the Court should remand for payment of benefits. (Doc. 13 at 1–2).

2      Before the Court are Villarreal's Opening Brief, Defendant's Response, and

3  Villarreal's Reply. (Docs. 13, 14, 15). Based on the pleadings and the administrative

4  record submitted to the Court, the Magistrate Judge recommends that the District Court,

5  after its independent review, remand this matter for an award of benefits.

6  **I.   Procedural History**

7      Villarreal filed an application for Supplemental Security Income ("SSI") and

8  Disability Insurance Benefits ("DIB") on August 23, 2011. (Administrative Record

9  ["AR"] 165). Villarreal alleged disability beginning January 1, 2008[1] (AR 165) based on

10 rheumatoid arthritis, depression, chronic fatigue, and limited mobility (AR 155).

11 Villarreal's application was denied upon initial review (AR 45–54) and on

12 reconsideration (AR 55–67). A hearing was held on February 28, 2013 (AR 24), after

13 which ALJ Laura Speck Havens found, at Step Four, that Villarreal was not disabled

14 because she was capable of performing her past relevant work as a sales representative

15 and a caseworker. (AR 18). On September 15, 2014 the Appeals Council denied

16 Villarreal's request to review the ALJ's decision. (AR 1–6).

17     Villarreal's date last insured ("DLI") for SSI and DIB purposes is September 30,

18 2010. Thus, in order to be eligible for benefits, Villarreal must prove that she was

19 disabled during the time period of her amended onset date of March 1, 2010 and her DLI

20 of September 30, 2010.

21 **II.   Factual History**

22     Villarreal was born on August 29, 1955, making her 54 at the alleged amended

23 onset date of her disability. (AR 136). Villarreal completed two years of college (AR

24 155), and has most recently worked as an independent sales representative selling

25 nutritional supplements, and as a resource specialist for a child and family counseling

26 agency (AR 156).

27

28 _____

[1] At the hearing before the ALJ, Villarreal amended her alleged onset date to March 1, 2010. (AR 28).

A.  Treating Physicians[2]

Dr. Alfred Wu at the Southeast Arizona Medical Center has been Villarreal's primary care physician for approximately 15 to 20 years. (AR 33). After the ALJ noted she was unable to read Dr. Wu's handwriting, Villarreal provided transcribed copies of Dr. Wu's notes for appointments from 2009–2011 to the Appeals Council. (*See* AR 536–578).

Dr. Wu saw Villarreal on July 3, 2007 for a complaint of bilateral hand and arm pain. (AR 283). Villarreal also saw Dr. Wu on July 25, 2007 (AR 286), September 14, 2007 (AR 287), July 29, 2008 (AR 377), and August 7, 2008 (AR 379), but no transcription of these appointments was provided and the Court is unable to decipher Dr. Wu's handwriting. The Court was able to discern that Dr. Wu saw Villarreal on January 29, 2008 for a follow-up for lower back pain and left hip pain. (AR 289).

On February 25, 2009 Villarreal saw Dr. Wu for a complaint of left shoulder pain and lower back pain. (AR 382; 537–39). She reported a 2–3 month history of constant pain on the left shoulder and lower back going down to the right knee, and 1 month of moderate intermittent dizziness. (AR 537). Dr. Wu assessed arthritis and prescribed Voltaren, and prescribed Holter/Antivert for dizziness.

Villarreal saw Dr. Jay D. Zamora for chiropractic treatment on March 6, 2009. (AR 507). She reported low back pain, progressively getting worse, which interfered with work, sleep, recreation, and daily routine, and made it painful to sit, walk, and bend. (AR 513). Villarreal stated she took muscle relaxers and pain killers, and noted she had been diagnosed with rheumatoid arthritis in 2006 or 2007. *Id.* Dr. Zamora diagnosed thoracic segmental dysfunction, lumbar segmental dysfunction, muscle spasm, and low back pain. (AR 507).

Villarreal saw Dr. Wu on April 15, 2009 for increased left shoulder pain. (AR 384,

---

[2]  While the Commissioner argues that the only relevant time period for consideration is March 1, 2010 to September 30, 2010 (Villarreal's alleged onset date through her DLI), the undersigned has included a summary of Villarreal's medical history from 2007 to 2012 (excluding appointments for unrelated conditions not at issue here) in order to provide  a complete picture of the nature and extent of her symptoms.

540–41). She reported worsening moderate constant pain on the left shoulder and decreased ability to move her left arm. (AR 540). Dr. Wu noted acupuncture was not helping the pain. He assessed persistent left shoulder pain and recommended an x-ray of the shoulder and a muscle relaxant.

On May 14, 2009 Villarreal saw Dr. Wu and reported her left shoulder still hurt a lot. (AR 542–43). Dr. Wu assessed shoulder pain with decreased range of motion and referred her to the Tucson Orthopedic Institute.

Villarreal was seen by Dr. Douglas A. Werner at the Tucson Orthopedic Institute on June 8, 2009 for an evaluation of left shoulder pain. (AR 294). She reported pain since fall 2008, that she has trouble elevating her arm, and that the pain gets worse throughout the day. On examination, Dr. Werner noted no swelling, rotation limited to the side, strength "pretty good," and mildly positive impingement exam. X-rays of the left shoulder showed "mild subacromial spurring but nothing dramatic and no significant arthritis." Dr. Werner recommended a subacromial injection and physical therapy ("PT"), and noted that shoulder pain was probably secondary to bursitis or tendonitis.

On June 16, 2009 Villarreal saw Dr. Wu for a follow-up appointment. (AR 544–45). She reported seeing an orthopedic doctor for her shoulder pain and noted some improvement with a cortisone shot. She also reported moderate constant left knee pain that was hurting more. Dr. Wu assessed left shoulder pain and worse right knee pain and recommended Villarreal continue with Voltaren.

Villarreal was seen by Dr. Wu on June 25, 2009 for a complaint of joint pain. (AR 243). Dr. Wu's impression was that findings from a dexa scan and QCT analysis were compatible with osteopenia of the lumbar spine.

On August 17, 2009 Villarreal saw Dr. Wu for a follow-up for left shoulder pain and knee pain. (AR 548–49). He referred her to Dr. Kate for her shoulder pain and prescribed a Flector patch for her knee.

On September 30, 2009 Villarreal saw Dr. Wu for a follow-up for shoulder pain. (AR 390, 550–53). She reported her shoulder was doing somewhat better with PT. (AR

550). She also reported a one year history of worsening back pain, and that prolonged sitting and standing made it worse. Dr. Wu assessed improving shoulder pain and recommended Villarreal continue PT, and that she have PT to evaluate and treat her worsening back pain.

Villarreal had a follow-up with Dr. Wegner on October 13, 2009 for shoulder pain. (AR 295). He noted that she did not get better with PT and that the therapist thought the problem could be coming from her cervical spine. Villarreal reported the pain was pretty severe, and the injection given at her last visit gave her 50 percent relief temporarily. On examination Dr. Wegner observed Villarreal was holding her shoulder somewhat depressed, range of motion was worse than previous, strength good but uncomfortable in all directions, positive impingement exam, and AC joint negative. X-rays showed mild subacromial spurring and no significant arthritis. Dr. Wegner gave Villarreal another subacromial injection, prescribed Vicodin, and recommended Villarreal continue with her exercise program. He also referred her to the spine center and for a MRI of her shoulder.

Villarreal was seen by Dr. Eugene Y. Mar on October 19, 2009 for evaluation of neck pain. (AR 296–97). She reported her pain was a 10 at its worst, most of the time it was a 3, and a 2 at its best. Sitting, standing, rising from sitting, walking, lying on stomach, lying on back, driving, coughing, sneezing, and bending backward all increased the pain. Villarreal reported the pain in her neck and shoulder began in May 2008, and that she takes Tylenol or Tylenol with codeine for pain. (AR 296). Following the examination and review of x-rays, Dr. Mar's impression was C5-6 cervical degenerative discs, C4-5 and C5-6 facet arthrosis, and left shoulder possible rotator cuff tear. (AR 297). Dr. Mar recommended PT twice per week for 4 weeks, and a follow-up appointment in 6 weeks.

Villarreal had a MRI of her left shoulder on October 28, 2009. (AR 312). The impression was: "1. Mild hypertrophic degenerative changes of the acromioclavicular joint likely with subacromial impingement as there is some edema at the musculotendinous junction of the supraspinatus. 2. Mild tendinosis of the supraspinatus

tendon without evidence of a high grade partial-thickness or full-thickening rotator cuff tear. 3. Degenerative changes of the glenoid labrum with a probable small superior labral tear."

Dr. Wegner saw Villarreal on November 4, 2009 for evaluation of her left shoulder. (AR 298). She reported some improvement with the cervical spine therapy, and 50 percent pain relief from the last injection Dr. Wegner gave her. On examination, Dr. Wegner noted a very positive impingement exam, some tenderness over the AC joint, and strength reasonably good. The MRI showed some AC joint hypertrophy and evidence of impingement but no significant cuff tear. Dr. Wegner assessed "impingement, probably a component of AC joint disease but also the cervical spine disease." He recommended Villarreal continue PT, and that "if her shoulder remains symptomatic enough, then an arthroscopy decompression distal clavicle resection would probably give her at least partial relief."

On November 23, 2009 Dr. Mar saw Villarreal for a follow-up. (AR 299). She reported pain in her neck, between her shoulder blades, and in the upper left trapezius, at a 5/10. Dr. Mar's impression was C5-6 cervical degenerative disks, C4-5 and C5-6 facet arthrosis, and left shoulder impingement syndrome. He recommended a MRI of the cervical spine and PT twice per week for 4 weeks. Dr. Mar noted Villarreal was having recurrence and worsening of symptoms after completing PT, and that he was going to send her for the MRI to see if she would benefit from spinal injections.

Villarreal had a MRI of the cervical spine on December 15, 2009. (AR 325–28). The impression was: "At C5/6, shallow central disc protrusion abutting the ventral cord. 2) At C4/5, shallow left paracentral disc protrusion abutting the cord. 3) At C6/7, mild ridging. 4) Motion artifact." (AR 327).

Dr. Mar saw Villarreal for a follow-up on December 15, 2009. (AR 300–01). She reported pain in her neck and left shoulder, with pain at a 3/10. On examination, Dr. Mar noted cervical spine range of motion flexion and extension give Villarreal neck pain. After reviewing the MRI, Dr. Mar's impression was C5-6 central disk protrusion, C4-5

central and left paracentral disk protrusion, and C6-7 degenerative disk. (AR 300). He recommended that Villarreal have spinal injections if she continued to be symptomatic after shoulder surgery, and prescribed Amrix for muscle spasms and discomfort. *Id.*

Dr. Wegner saw Villarreal on December 16, 2009 for shoulder pain. (AR 303). He noted she was not doing particularly well and had significant neck pain and pain in the glenohumeral joint. Dr. Wegner observed reasonably good range of motion, tender AC joint, positive impingement exam, and significant neck pain radiating to the trapezial region. He assessed multifactorial, persistent left upper extremity pain, and scheduled Villarreal for a shoulder arthroscopy, decompression, and distal clavicle resection.

On December 17, 2009, Villarreal had surgery on her left shoulder. (AR 302, 310–11). Her pre and postoperative diagnoses were left shoulder impingement and AC joint arthritis. (AR 310). Findings were "[n]o full-thickness rotator cuff tear, but significant bursitis and AC joint arthritis." *Id.* At a follow-up on December 29, 2009, Dr. Wegner noted part of her pain had been relieved. (AR 304). He recommended shoulder range of motion exercises and light strengthening.

At a follow-up with Dr. Wegner on January 22, 2010, Villarreal reported she was still having a fair amount of neck pain. (AR 305). Dr. Wegner recommended PT and an evaluation of her neck.

On February 15, 2010 Dr. Mar reported that Villarreal called and spoke with the medical assistant about neck and left arm pain. (AR 309). He referred her for a left C5 selective nerve root block and C7-T1 cervical epidural injection of steroids.

Villarreal was seen by Dr. A. Reid Bullock on February 19, 2010 for a cervical transforaminal epidural steroid injection. (AR 278).

On March 8, 2010 Villarreal saw Dr. Wegner for a follow-up for shoulder pain. (AR 306). He noted "[s]he is not doing much better and, in fact, she has probably slid back a little bit." Dr. Wegner observed that Villarreal had generalized pain that was probably coming more from the neck than the shoulder. He prescribed a refill of Vicodin and recommended she continue with PT.

On March 31, 2010 Villarreal saw Dr. Wu for a follow-up and reported pain in both shoulders, neck pain, upper back pain, and body aches. (AR 392; 554–55). He noted she was feeling depressed and discouraged about the persistent pain. (AR 554). Dr. Wu prescribed Votaren and reassured Villarreal about her anxiety.

On April 14, 2010 Villarreal saw Dr. Wu for a follow-up for shoulder pain. (AR 393, 556–57). She reported moderate constant pain that was not better and was worse the past two weeks from the cold weather, and was worried her left shoulder was not getting better. (AR 556). Dr. Wu assessed shoulder pain with decreased range of motion and prescribed Vicodin and Flexeril, and reassured Villarreal about her anxiety.

Dr. Wegner saw Villarreal for a follow-up on June 4, 2010 and noted she was still having a lot of problems. (AR 307). On exam, Dr. Wegner observed very limited range of motion and limited rotation of the left shoulder, and pain in the trapezius and neck. He assessed "adhesive capsulitis, stiff shoulder, but I think she has a significant problem going on with the neck as well." He recommended Villarreal see a doctor for her neck and that she continue strengthening and stretching on her own, and noted the PT had not really made a difference.

On June 7, 2010 Villarreal saw Dr. Wu for a complaint of persistent left shoulder pain and upper back pain. (AR 395, 559–60). She reported her shoulder had not improved after surgery, and she had been more tired than normal the past 2 months. (AR 559). Dr. Wu assessed persistent shoulder pain, upper back pain, and fatigue and referred her for a neurological consult with Dr. Sanan.

Villarreal was seen by Dr. Abhay Sanan at the Center for Neurosciences on October 26, 2010 for left shoulder symptoms. (AR 330). Dr. Sanan noted Villarreal's "left should demonstrates pain with passive movement, particularly passive abduction of her left arm produces significant pain." (AR 331). He also noted Villarreal had a left shoulder droop and was unable to shrug her left shoulder, which suggested a possible spinal accessory nerve injury. *Id*. Dr. Sanan reviewed the MRI from December 15, 2009 and noted Villarreal had minimal spondylitic diseases, no significant nerve root

compression, and that "the study actually looks quite good." *Id*. His impression was that "I do not see any good evidence to suggest a radiculopathy," and he ordered a MRI of the left shoulder and "an EMG exam to look for any evidence of spinal accessory nerve injury as an explanation for her inability to lift her left shoulder." *Id*.

Villarreal had a nerve conduction study for the upper left extremity at the Center for Neurosciences on November 22, 2010. (AR 321). Results were normal. Villarreal also had a MRI of her left shoulder on November 22, 2010. (AR 329). The impression was "1) Minimal supra/infraspinatus tendinopathy. 2) Mild subacromial impingement left shoulder." *Id*. Findings were normal bicep tendon, no glenoid labral tear, no rotator cuff tear, and no glenohumeral joint effusion or bursitis. *Id*.

A letter from Dr. Sanan to Dr. Wu dated January 13, 2011 notes "that the EMG and nerve conduction velocities were normal in the upper left extremity." (AR 333). The letter states Dr. Sanan phoned Villarreal and she reported that her shoulder was not any better, and that the pain was also in her neck and right shoulder. *Id*.

On January 27, 2011 Villarreal saw Dr. Wu for a follow-up for shoulder pain. (AR 396, 564–65). She reported she was still having a lot of shoulder pain and left upper back pain, and was very anxious and worried about rheumatoid arthritis. (AR 564). Dr. Wu assessed left shoulder and left upper back pain and reassured Villarreal about her anxiety.

Villarreal saw Dr. Wu on February 9, 2011 and reported a 2 week history of moderate constant shoulder pain bilaterally. (AR 566–67). He prescribed Flexeril.

On March 31, 2011, Villarreal saw Dr. Ulker Tok for a rheumatology consultation. (AR 339). Villarreal complained of upper and lower back pain and left shoulder pain. The pain is worse when she does housework, she cannot sleep on her left side, and it hurts to turn her neck to the left. She drops things from both hands but more often with the left, her left shoulder drops due to pain, and her hands and legs tingle. On examination, Dr. Tok noted pain in the C spine on rotation, left trapezius is tender, left should is tender and dropped and has loss of extension, wrists and MCPS tender but not swollen, and knees, ankles, and forefeet are tender. (AR 340). Dr. Tok's impression was "1) Arthritis left

shoulder. 2) Left frozen shoulder. 3) Polyarthralgias/arthritis." *Id*. He gave Villarreal an injection in her left shoulder, instructed her to do range of motion exercises, and prescribed Methotrexate and folic acid. *Id*.

On April 8, 2011 Villarreal saw Dr. Wu for a follow-up on left shoulder pain and upper back pain. (AR 398, 568–69). He assessed left shoulder pain, rheumatoid arthritis, upper back pain, and anxiety, and noted Villarreal should try what the rheumatologist recommended. (AR 568).

Villarreal saw Dr. Wu for another follow-up for left shoulder pain on June 9, 2011. (AR 399, 570–71). She reported feeling worse pain the past 2 weeks and fatigue, and some night leg cramps. (AR 570). Dr. Wu assessed worsening left shoulder pain and rheumatoid arthritis, and advised her to continue treatment with Dr. Tok for her shoulder pain.

Villarreal saw Dr. Tok for a follow-up on June 24, 2011. (AR 337). She reported some relief from the Methotrexate and did not have excruciating pains anymore. Villarreal stated she still had pain in her left shoulder, bottoms of her feet, lower back, mid back, and neck. She also reported poor sleep, fatigue, and depression. On examination, Dr. Tok noted pain in the left shoulder on range of motion and tender sore feet. His impression was 1) inflammatory polyarthropathies, 2) low back pain, and 3) fibromyalgia. Dr. Tok increased the Methotrexate and also prescribed Cymbalta, and ordered an x-ray of the lower spine.

Villarreal had x-rays of her lower spine on July 1, 2011. (AR 352). No acute abnormalities were identified, and the x-rays showed minor degenerative change.

On July 8, 2011, Dr. Wu completed a medical excuse from jury service form for Villarreal, noting that she had severe pain in the shoulder and lower back with any prolonged sitting or standing. (AR 400).

Villarreal saw Dr. Wu on July 20, 2011 for a follow-up of rheumatoid arthritis and persistent moderate constant pain in the left shoulder and upper back, worse with rainy weather. (AR 572–73). Dr. Wu noted she was very anxious about the persistent pain that

was getting worse instead of better. He assessed worsening rheumatoid arthritis and recommended she continue with her current medications.

On September 26, 2011, Villarreal saw Dr. Tok for another rheumatology follow-up appointment. (AR 335). She reported improvement of overall pain and mobility with Methotrexate, and that she could dress herself now. Villarreal stated she still got pain in her left shoulder when lifting her arm, had neck pain that prevented her from turning her head to the left, low back pain radiating to the right leg that prevented her from walking distances, and morning pain in her feet. On examination Dr. Tok noted pain on lateral bending the C spine, tender L spine, pain in the left shoulder on range of motion, and tender bilateral plantar fascia. His impression was 1) rheumatoid arthritis, 2) high risk medication, 3) cervical spondylosis, 4) low back pain, 5) depression, 6) abdominal pain, and 7) bilateral plantar fasciitis. (AR 336). Dr. Tok prescribed Leucovorin, Prilosec, Prozac, and Voltaren. He also referred Villarreal back to neurosurgery due to the loss of range of motion in her C spine, and referred her to PT for her neck and lower back pain.

On October 18, 2011 Villarreal saw Dr. Wu to discuss her ultrasound and dexa scan results. (AR 402; 575–76). She reported moderate constant left shoulder pain, moderate constant upper back pain, and decreased grip strength. (AR 575). Dr. Wu assessed worsening rheumatoid arthritis and recommended she increase use of NSAID or Tylenol.

On December 19, 2011 Villarreal saw Dr. Tok for a rheumatology follow-up. (AR 470). She complained of left shoulder pain and limited range of motion, pain in her right hand, and foot pain. Dr. Tok's impression was 1) rheumatoid arthritis, 2) high risk medication, 3) shoulder joint pain, and 4) abdominal pain. (AR 471). Dr. Tok gave Villarreal an injection in her shoulder and prescribed Plaquenil.

Villarreal saw Dr. Wu on December 27, 2011 for a rheumatoid arthritis follow-up. (AR 577–78). She reported not getting any better and feeling worse with cold weather. Dr. Wu recommended she decrease Cholofen when better.

At a urology appointment on January 23, 2012, Villarreal reported muscle

weakness, memory lapses or loss, depression, and pain in her neck, shoulders, right hand and wrist, knees, feet, and hips. (AR 372).

At a regular check-up with Dr. Wu on March 6, 2012, Villarreal complained of right hand pain. (AR 405).

On March 19, 2012 Villarreal saw Dr. Tok for a follow-up. (AR 472). She complained of neck pain, left shoulder pain, and numbness in the left arm with neck pain, and stated she could not turn her head to the left of drive because of the neck pain. Dr. Tok's impression was 1) rheumatoid arthritis, 2) high risk medication, 3) cervicalgia, and 4) shoulder joint pain. (AR 473). He referred Villarreal for a MRI for the C spine and to neurosurgery for her continued neck pain, and prescribed Savella.

Villarreal had a MRI of the cervical spine on March 30, 2012. (AR 484). The impression was "C4-5 and C5-6 have left paracentral disk protrusion which is pressing on the left side of the spinal cord. There is no cord edema."

On April 16, 2012, Villarreal saw Dr. Wu with a complaint of shoulder pain, fatigue, and dizziness. (AR 406). He assessed left shoulder pain, cervical disc bulging, decreased range of motion of the left shoulder, anxiety, and dizziness.

Villarreal saw Dr. Wu on April 26, 2012 for a follow-up for dizziness and anxiety. (AR 407). He assessed dizziness, anxiety, and decreased range of motion of the left shoulder.

On May 10, 2012 Villarreal saw Dr. Jon Nisbet for a complaint of pain in the neck, scapular region, trapezial fold, and left shoulder. (AR 448). He noted a history of arthritis, joint pain, muscular weakness, stiffness, muscle pain, depression, dizziness, weakness, and fatigue. On examination Dr. Nisbet noted Villarreal "has pain at the extremes of all range of motion . . . remarkable tenderness at the interscalene triangle of the left base of neck . . . [and] significant pain in the base of neck and scapular region with [shrug and retraction]." (AR 451). His impression was adhesive capsulitis, thoracic outlet syndrome, and cervical spondylosis. *Id*. He noted that while Villarreal's nerve conduction study was normal, "thoracic outlet rarely shows up on an EMG/nerve

conduction study and may still be present." *Id*. Dr. Nisbet recommended Villarreal do PT and home exercises, and he administered an injection to her left shoulder. (AR 451–52). After the injection, Villarreal "reported marked relief from symptoms, especially no pain at the extremes of motion passively obtained." (AR 452).

Villarreal saw Dr. Tok for a rheumatology follow-up on May 18, 2012. (AR 474). She complained of pain in her left shoulder, left trapezius, and neck, whole body pain, and joint pain in her fingers. Dr. Tok's impression was 1) rheumatoid arthritis, 2) high risk medication, 3) cervicalgia, and 4) adhesive capsulitis shoulder. (AR 475). He referred Villarreal for PT and prescribed Gabapentin.

On May 24, 2012 Villarreal saw Dr. Wu for a follow-up for neck discomfort. (AR 408).

On June 11, 2012 Dr. Wu saw Villarreal and assessed neck pain and left shoulder pain. (AR 409).

Villarreal saw Dr. Nisbet for a follow-up on July 9, 2012. (AR 453). She reported the injection improved her shoulder motion and pain control but that some shoulder pain had returned. Dr. Nisbet's impression was adhesive capsulitis, thoracic outlet syndrome, cervical spondylosis, and rheumatoid arthritis. He encouraged Villarreal to follow-up with chronic pain management and continue PT. (AR 453–54).

On August 20, 2012 Villarreal saw Dr. Nisbet for another follow-up. (AR 455). She reported her left shoulder was significantly improved since her initial appointment with Dr. Nisbet, but that she continued to have episodic pain in the trapezial fold, scapular region, and base of neck. On examination Dr. Nisbet noted "no pain at the extremes of motion and patient has very good rotator cuff strength." His impression was adhesive capsulitis and cervical spondylosis, and he recommended Villarreal continue PT and see a chronic pain management specialist. (AR 455–56).

On August 20, 2012 Villarreal saw Dr. Tok for a rheumatology follow-up. (AR 476). She complained of neck pain and diffuse joint pains. Dr. Tok's impression was 1) rheumatoid arthritis and 2) high risk medication. (AR 477). He prescribed Enbrel,

Diclofenac, and Tramadol.

Villarreal had a follow-up appointment with Dr. Nisbet on September 28, 2012. (AR 457). Villarreal stated she did not want to follow-up with her cervical spine surgeon or chronic pain management doctors. She reported an increase in shoulder pain and requested another injection. Dr. Nisbet's impression was left adhesive capsulitis, left cervical spondylosis, and left rheumatoid arthritis. He gave Villarreal another injection in her shoulder but noted it was not likely to resolve her symptoms without further therapy and evaluation of her neck.

On November 26, 2012 Villarreal saw Dr. Nisbet for a follow-up appointment. (AR 459). She reported new pain in her right shoulder and cervical spine pain, and noted that the injection in her shoulder helped but wore off after a few weeks. Dr. Nisbet's impression was left adhesive capsulitis, left cervical spondylosis, and left rheumatoid arthritis. (AR 459–60). He noted there was no long-term gain from continuing to give Villarreal injections in her shoulder, and advised that oral antimetabolites or anti-inflammatories were a better choice to treat her multiple joint complaints.

Villarreal saw Dr. Tok on November 26, 2012 for a rheumatology follow-up. (AR 478). She complained of left shoulder pain, pain in hands and PIP joints, pain in ankles and feet, and pain in thighs when walking. Dr. Tok's impression was 1) rheumatoid arthritis and 2) high risk medication. (AR 479). He recommended Villarreal continue Methotrexate, Tramadol, and Diclofenac, discontinue Enbrel, and increase her dosage of Prozac. Dr. Tok also referred Villarreal for a MRI of the left shoulder.

B. Physical Therapy

Villarreal had several courses of PT at the Southeast Arizona Medical Center Rehabilitation Department in 2009 and 2010. PT progress notes from 2009 and 2010 indicate that Villarreal had some improvement in her conditions but that she also reported continued pain and limitations. Villarreal completed 12 treatments from June 18, 2009 to August 17, 2009 for left shoulder pain. (AR 249).

> June 20, 2009: Villarreal reported she had some pain over the weekend but nothing like before.

June 25, 2009: Villarreal stated the cortisone shot really helped. The therapist assessed multiple dysfunctions, mal-alignments, rotations, and restrictions.

(AR 256).

June 29, 2009: Villarreal reported she was sore after PT last week but then felt better. Therapist noted severe tightness and restrictions.

July 1, 2009: Therapist noted decreased tightness of the lower back and pelvis, and increased alignment.

July 6, 2009: Villarreal noted she traveled better than normal in the car over the weekend.

July 8, 2009: "sore, but getting better."

(AR 255).

July 8, 2009: improving mobility in spine but left lumbar papaspirals remain quite tight

July 13, 2009: Shoulder was really hurting this weekend

July 15, 2009: Therapist noted left shoulder joint and rib hypomobility improving

July 20, 2009: Villarreal report pain 8/10

July 22, 2009: Villarreal stated she still has pain but it is better

(AR 254).

August 17, 2009: Villarreal reported taking a muscle relaxer but it did not help with pain. Overall her pain is better. Therapist noted decreased pain with PT and that Villarreal was responding to PT.

(AR 253). On an outpatient progress report/discharge report dated August 17, 2009, the therapist noted that Villarreal was "progressing well although progress is slow [due] to multiple dysfunctions of C-T-L spine" and that assessment revealed dysfunction of the left shoulder. (AR 249). The therapist recommended Villarreal continue PT twice per week for an additional 6 weeks "to normalize vertebral alignment, muscle tone & function of [left] shoulder."

August 25, 2009: Continued improvement but left shoulder blade is still most bothersome.

August 26, 2009: Sore, but continuing to improve.

(AR 253).

September 3, 2009: "Mid & low back are pretty good, but my [left] neck & shoulder are hurting."

September 9, 2009: "I had 2 very good days, 2 so-so days."

September 10, 2009: "Sore, but that horrible shoulder pain I get was gone."

September 15, 2009: "I didn't have the intense pain in my [shoulder], but my [lower back] is sore."

(AR 252).

September 17, 2009: "I'm hurting bad today, same area. I can't lift my [left] arm."

September 22, 2009: "Much better today."

September 24, 2009: "I'm able to lift my [left] arm now."

September 29, 2009: "Not as bad over the weekend as it usually is, I still feel it pulling on my neck."

(AR 251).

October 5, 2009: "I've been in horrible pain all weekend— my neck, front of [shoulder] & [shoulder] blade in back. Can't move or lift my [left] arm."

(AR 250).

October 7, 2009: pain level down some, but not back to what it was before last flare-up

October 21, 2009: "Pain is the same." Therapist noted "multiple restrictions/rotations throughout C spine, T spine."

(AR 264).

October 27, 2009: "I had a flare up this weekend."

November 3, 2009: "I think it's getting better." Therapist noted gradual improvement.

1   November 9, 2009: Therapist noted left C2–5 locked, very
2   little movement.

3   (AR 263).

4       November 12, 2009: "I had a very good day Monday and
5       Tuesday." Therapist noted "c-spine gradually improving
        [with] mobility."

6       November 17, 2009: "Doing better. I'm having good days
7       where the pain level is 2–3/10 & my worst day was a 5/10."

        November 18, 2009: "Still getting better."
8
        November 30, 2009: Therapist noted extension was the most
9       painful.

10  (AR 262). On a progress report dated November 18, 2009, the therapist noted Villarreal

11  was progressing well with a better response than she previously had with PT. (AR 261).

12  The therapist also noted pain had decreased from a 7–8/10 average to a 2–3/10. *Id*. She

13  recommended Villarreal continue PT twice a week for 4 more weeks. *Id*.

14      December 2, 2009: "My neck/shoulder flared up last night &
15      it has been terrible since—pain level 10/10."

16      December 7, 2009: "So much better than that day I had last
17      week."

        December 9, 2009: "Sweeping and mopping sets off my
18      neck."

19      December 14, 2009: "I used my arm too much yesterday &
20      now it & my neck are very painful." Therapist noted muscle
        tightness throughout shoulder and neck.

21  (AR 258, 260). On a discharge report dated December 14, 2009, the therapist noted that

22  Villarreal was not progressing with her shoulder and that she continues "to have severe

23  pain, especially if she uses it." (AR 259). The therapist also noted muscle spasms with

24  range of motion and protective tightening of the shoulder muscles. *Id*. The therapist

25  recommended Villarreal discontinue PT for her left shoulder and that she have surgical

26  correction of bone spurs. *Id*.

27      February 8, 2010: shoulder, chest, and neck muscles very
28      tight and sore

- 17 -

February 10, 2010: patient range of motion limited by pain

February 11, 2010: "better today;" range of motion gradually increasing, pain at end range

February 15, 2010: "I had a very bad day yesterday"

February 16, 2010: "My shoulder feels much better … 1st day where I haven't been completely miserable."

(AR 274).

February 23, 2010: "I had a shot in CS last Fri.— it hasn't helped much." Therapist observed visible swelling at the sternoclavicular joint; noted Villarreal was progressing as expected but still in a lot of pain.

February 25, 2010: "Not any better. I'm so tired of being in pain all of the time." Therapist called doctor's office "regarding lack of  progress, edema & pain," and noted Villarreal's range of motion was still limited and not improving.

(AR 273).

March 1, 2010: Therapist "spoke [with] Dr. Wegner's nurse, Nancy, about [patient's] lack of progress, pain & edema."

March 9, 2010: Therapist noted a new order was received for range of motion and cuff strengthening, and that Villarreal attempted pulleys but it was very painful.

March 11, 2010: "I think I'm a little bit better today."

(AR 272).

March 16, 2010: Villarreal reported doctor was going to refer her to another physician for neck, back, and shoulder problems.

March 17, 2010: muscle spasming locks movement past 90 degrees.

March 25, 2010: "I was a little better yesterday."

(AR 271).

March 30, 2010: Villarreal reported her shoulder felt much better over the weekend, that her neck and upper part of shoulder close to the neck hurt, and that she still can't move her shoulder. Therapist noted she was unable to move her shoulder past 90 degrees.

> April 1, 2010: Therapist noted Villarreal was able to loosen tight muscles better.
>
> April 6, 2010: Villarreal reported she was a little better and could move her arm some more. Therapist noted Villarreal was more relaxed but range of motion still limited at 90 degrees.

(AR 270). On a progress report dated April 7, 2010, the therapist noted "progress continues to be limited due to severe involuntary spasming," and that Villarreal was "on high doses of anti-inflammatories and pain meds by PCP that is minimally helping." (AR 275). The therapist recommended Villarreal continue PT twice per week for 4 weeks. *Id*.

> April 12, 2010: "I had real bad days Fri & Sat"
>
> April 14, 2010: "Miserable last night & today. I'm so tired of this." Therapist noted shoulder range of motion stops hard at 80 degrees.
>
> April 18, 2010: Therapist noted slightly more range of motion, but protective tightening still present.
>
> April 21, 2010: Villarreal reported she had more range of motion but hated "being this doped up" on new muscle relaxer. Therapist noted muscle spasms were significantly decreased.

(AR 269).

> May 6, 2010: Finally making improvement.

(AR 268).

On a discharge report dated October 1, 2010, the therapist noted Villarreal continued to have muscle spasms that disallow movement and that she had continued pain with range of motion. (AR 267).

On May 17, 2012 Villarreal had a PT evaluation. (AR 501). She reported left shoulder, arm and cervical pain since 2008, and stated her current pain was a 5/10 with activity, and 2/10 at rest. On examination, the therapist noted her left side was positive for pain on shoulder flexion, extension, abduction, external rotation, and internal rotation. (AR 501–02). The therapist recommended PT twice a week for 4 weeks, and noted Villarreal's prognosis for goal achievement was good. (AR 502).

> July 2, 2012: Therapist noted Villarreal was making slow and consistent improvement with periodic exacerbations due to her rheumatoid arthritis.
>
> August 13, 2012: Therapist noted Villarreal was doing well and that she needed to consistently follow her home exercise program to keep symptoms from returning.

(AR 503). Villarreal was discharged from PT on August 16, 2012 based on sufficient goal attainment, with the therapist noting that: "Client has progressed nicely and can now continue [independently] with her [home exercise program.]." *Id*.

Villarreal attended additional physical therapy sessions in fall 2012. On September 24, 2012 the therapist noted "Her tolerance to exercise is still poor at best" and "Prognosis for goal achievement is good." (AR 504). On October 16, 2012 the therapist again noted "Prognosis for goal achievement is good." *Id*. Villarreal was discharged from PT on December 6, 2012 after failing to return. The therapist noted her thoracic outlet syndrome "improved markedly with nearly normal range (90%) and improving strength." *Id*.

### C. Mental Health Treatment

Dr. Ernestina Buck provided treatment notes for her counseling sessions with Villarreal from February 2012 through May 2013.

On February 24, 2012 Dr. Buck noted Villarreal presented with chronic pain, wakes up every morning with pain, cries herself to sleep often, is unable to type and sit long enough to do much, and still has severe pain after shoulder surgery. (AR 519).

On March 2, 2012 Dr. Buck noted Villarreal reported continued pain and fatigue, and stated she had minimal benefit from PT. (AR 520). Dr. Buck assessed Villarreal to have a blunted affect, and a helpless and somewhat anxious mood.

On March 15, 2012 Villarreal stated she was concerned that she might have fibromyalgia but was fearful of mentioning this again to her rheumatologist. (AR 520). Dr. Buck observed a blunted affect and depressed mood.

On April 4, 2012 Villarreal reported increased pain, poor memory, and lack of motivation and interest in things. (AR 522).

On April 11, 2012 Villarreal reported a decrease in pain and that she was walking every day, with severe fatigue on some days. (AR 522). Dr. Buck observed that she was doing better with an improved mood, less pain, and was engaged in relaxation and pain management skills well.

On April 18, 2012 Villarreal reported decreased pain. (AR 521). Dr. Buck observed a brighter than usual affect and noted Villarreal had fewer pillows propping her up.

On May 2, 2012 Villarreal reported she was having a good day and had been dealing better with the pain. (AR 521). Dr. Buck observed Villarreal seemed to be improving and had a brighter affect and more relaxed mood.

On May 9, 2012 Villarreal reported she was walking 4 days per week. (AR 521). Dr. Buck observed a somewhat depressed/anxious mood and blunted affect, but noted Villarreal was brighter than in the past.

On May 23, 2012 Villarreal reported walking most days. (AR 523). Dr. Buck observed a brighter mood and some smiling, and noted Villarreal seemed to be feeling more hopeful.

On May 30, 2012 Villarreal reported doing much better due to increased stamina from exercise, and using her relaxation skills more. (AR 523). Dr. Buck noted Villarreal was somewhat fatigued and tired with low energy, but peaceful.

On June 13, 2012 Villarreal reported she was not walking as much. (AR 525). Dr. Buck observed a sad mood, somewhat anxious, and blunted affect.

On June 20, 2012 Villarreal reported she did not walk that week and had a decrease in stamina. (AR 525). Dr. Buck observed a tired affect, fatigue, low energy and mood.

On July 3, 2012 Villarreal reported continued pain. (AR 524). Dr. Buck observed a brighter affect and mood in general.

On July 31, 2012 Villarreal noted she had continued to gain motion in her shoulder with PT. (AR 524). Dr. Buck observed that she seemed to be reluctant to

recognize ground gained rather than lack of progress. Dr. Buck noted Villarreal's movements were less guarded, less stiff, and more quick in general, but that she still moved with difficulty.

On August 14, 2012 Villarreal reported increased pain and fatigue. (AR 524). Dr. Buck observed her to be moving not as quickly or easily as their past four sessions, and noted a somewhat blunted affect.

On August 28, 2012 Dr. Buck observed Villarreal was somewhat anxious and depressed, and tearful and sad when discussing her son. (AR 527).

On September 11, 2012 Villarreal reported increased pain and noted she had not gone to PT for 3 weeks due to billing issues. (AR 527). Dr. Buck noted that her mood seemed to be stable.

On January 17, 2013 Villarreal reported continued pain in her left shoulder and increased pain in her right shoulder, and a bulging disk in her neck. (AR 528). Dr. Buck observed a blunted affect and somewhat depressed mood.

On April 9, 2013 Villarreal reported she was very emotionally sensitive, had not been walking or doing PT due to pain, and her memory was bad. (AR 526). Dr. Buck observed a depressed mood and blunted affect and noted Villarreal lost track of what she was talking about during the session.

On May 22, 2013 Villarreal reported her pain was increasing all over, especially in her lower back. (AR 529).

### D. Additional Medical Information

On August 14, 2012, Dr. Buck completed a Mental RFC Assessment form. (AR 440–41). She opined that Villarreal was markedly limited in the following areas: ability to understand and remember detailed instructions, ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, ability to make simple work-related decisions, ability to complete a normal workday and workweek without interruptions from psychologically

based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. *Id*. Dr. Buck also opined Villarreal would miss 5 or more days of work per month due to mental illness. (AR 441).

On May 29, 2013 Dr. Buck completed a Mental Impairment Questionnaire. (AR 530–535). She noted Villarreal was engaged during counseling appointments but had missed many due to poor health, and that her memory impaired her ability to follow through on assignments. (AR 530). Dr. Buck stated Villarreal "has had decreased functioning regarding mood, energy, and especially memory. She has poor sleep cycles with chronic exhaustion. Severe chronic pain interacts with her mental capacity" and that her prognosis was "guarded to poor." *Id*. Dr. Buck indicated Villarreal had no useful ability to function in the following work-related areas: maintain regular attendance and be punctual within customary, usually strict tolerance; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; deal with normal work stress; understand and remember detailed instructions; carry out detailed instructions; deal with stress of semiskilled and skilled work. (AR 532–33). Dr. Buck also opined Villarreal had marked limitations in activities of daily living and maintaining social functioning, and an extreme limitation in maintaining concentration, persistence, and pace. (AR 533). Dr. Buck stated Villarreal's impairments would cause her to be absent from work more than 4 days per month, and that her impairment had lasted or could be expected to last at least 12 months. (AR 535).

Dr. Wu completed a Physical RFC Assessment form on August 14, 2012. (AR 485). Dr. Wu opined that Villarreal could stand for less than 2 hours in an 8 hour work day, sit for 15–30 minutes without needing to change position, walk for 1 block, and never lift and carry 10 pounds. He further noted Villarreal had the capacity to reach and grasp for 2 hours or less, and the capacity for feeling/fingering/handling for 2–6 hours. Dr. Wu indicated Villarreal would need to lie down during the day and alternate sitting

and standing every hour, and that she would miss more than 5 days of work per month.

On July 2, 2013 Dr. Wu provided an addendum to his RFC assessment stating that Villarreal experienced the functional limitations he noted on the August 14, 2012 form during the period of March 1, 2010 through September 2010. (AR 579). He opined that Villarreal would be off task 25% or more of the work day, and that her symptoms were severe enough from March 1, 2010 through September 2010 to interfere with attention and concentration or ability to persist at a task at work. Dr. Wu also indicated that Villarreal suffered from severe fatigue and malaise from March 1, 2010 through September 2010, and that she was resting frequently at home. He opined that from March 1, 2010 through September 2010, Villarreal could sit in an office chair typing and looking at a computer monitor for 10–15 minutes at a time, once or twice daily.

E.  State-Agency Physicians

Dr. Raymond Novak found that Villarreal had the following severe medically determinable impairments: dysfunction—major joints, spine disorders, and inflammatory arthritis. (AR 61). He also noted there was insufficient evidence to substantiate the presence of a psychiatric disorder. Dr. Novak found that Villarreal's statements about the severity of her symptoms were only partially credible because prior to her DLI, the severity of her subjective complaints was not fully supported by objective evidence. (AR 62).

Dr. Robert S. Hirsch completed a RFC assessment for Villarreal on June 25, 2012. (AR 62–65). He found Villarreal could: occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and walk for 6 hours in an 8 hour work day, sit for 6 hours, and do limited pushing and pulling with her left upper extremity. (AR 63). Dr. Hirsch also found the following postural limitations: unlimited climbing ramps and stairs, occasionally climb ladders, unlimited balancing, frequently stoop, unlimited kneeling, unlimited crouching, and frequent crawling. (AR 63–64). For manipulative limitations, Dr. Hirsch stated Villarreal could occasionally reach overhead with her left shoulder, and could perform unlimited handling, fingering, and feeling. (AR 64).

F.  Plaintiff's Testimony

On a Function Report dated November 3, 2011 Villarreal reported her conditions limit her ability to work because of: limited movement, constant pain, unable to concentrate, forgetfulness, unable to drive extended periods, sitting causes lower back pain, medication side effects, difficulty staying focused, limited walking and standing, fatigue, can only lift 0–3 pounds with her left hand, work very slow, and takes longer to accomplish tasks. (AR 169). She takes frequent naps and rest periods throughout the day, (AR 170, 175–77), and when sleeping at night she constantly changes position due to pain (AR 170). She reported watching her grandchildren but noted her husband assists most of the time. (AR 170). Because of her illness, Villarreal stated she can no longer work fulltime, travel and drive long distances without pain and discomfort, clean the entire house, cook full meals, do outside activities or social activities, play with her grandkids, carry a gallon of milk, grocery bags, or laundry baskets, exercise, bathe without assistance, or shop for longer than 30–45 minutes. (AR 170, 176). Pain in her neck and shoulder and limited movement of her left arm make it hard to dress, bathe, wash her hair, and shave. (AR 171). She prepares simple meals like scrambled eggs, oatmeal, and sandwiches, but cannot cook full meals. (AR 171). She is able to do light cleaning such as wash a few dishes, dust, limited sweeping, and light laundry, but needs encouragement and assistance when she is in pain. (AR 172). She drives but only short distances to pick up her grandsons from school. (AR 172, 173). Her hobbies include walking, reading, watching tv, and doing computer research, but she is unable to walk long distances and has limited computer time due to neck and back pain, and she mostly stays home due to pain, fatigue, and medication side effects. (AR 173–74). Villarreal reported that her illness affects her ability to: lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, and use her hands, and affects her memory and concentration. (AR 174). She can lift about 5 pounds with her left hand, can walk for 10 to 15 minutes and then needs to rest for 5 to 10 minutes, stand for 15 to 30 minutes, sit for 15 to 30 minutes and then stand and stretch or walk before resuming sitting, and pay

attention for 15 minutes. (AR 174, 176). Her medications cause side effects including nausea, fatigue, upset stomach, tiredness, dizziness, and drowsiness. (AR 176).

On a Disability Report dated February 24, 2012 Villarreal reported additional, constant pain in both hands, more intense in the right hand, and weakness and loss of grip. (AR 195). She stated this change occurred December 15, 2011. She again reported her medications caused side effects including dizziness, drowsiness, fatigue, and nausea. (AR 197). Villarreal stated she could not do the following activities: carry heavy bags of food, pick up children or play with them on the floor, take care of other people, sleep well, stand for long periods of time in front of the stove or sink, reach up high, bend down low, lift and carry heavy items, wash all dishes without taking frequent breaks, use a broom, mop, or vacuum cleaner, clean more than one room without resting, move furniture, carry heavy laundry baskets, hang up clothes in the closet, drive without limitations, sit for long periods, take car trips without stopping frequently, walk for long periods, load heavy grocery bags into the car, stand in line for long periods, do her favorite hobbies, use hands to type for long periods, and do social activities. (AR 202–03). Villarreal also reported she cannot handle stress and does not always finish what she starts or understand what is going on. (AR 203). She noted similar limitations on another Function Report dated June 9, 2012. (*See* AR 211–12).

Villarreal testified at her hearing before the ALJ on February 28, 2013 that during the timeframe of March through September 2010 she needed assistance with bathing and dressing (AR 29), did very minimal household chores, and did not cook, wash dishes, mop or sweep, do laundry, or go grocery shopping (AR 30). She watched tv for about 30 minutes 3 times a day and could not do any other hobbies (AR 31), and had no activities outside the home (AR 32). She hardly drove, but drove to the drug store about a mile away from her home. (AR 32). Villarreal testified that 2010 "was one of my bad years" and that she couldn't sleep well and had to keep changing positions. (AR 33). In 2010, she could walk and stand for 15–20 minutes at a time, sit for 15–20 minutes, and could hardly lift anything due to pain. (AR 37–38). The pain was in her left shoulder, upper

back, head, neck, and low back, and "It was all the time in one place or another." (AR 38). The pain was at a 7 or 8 out of 10 with medication. (AR 39). She also had pain in her hands, worse in the right hand, and could not use a keyboard or pick up large books. *Id.* Villarreal testified that since 2010, her condition had pretty much stayed the same or is maybe a little bit worse because she is always in pain and fatigued. (AR 39–40). She was depressed in 2010 because she was always at home except for her doctor appointments, but she did not see a doctor for her depression because she thought it would go away. (AR 40).

### G. Lay Testimony

Villarreal's husband completed a Function Report dated November 4, 2011. (AR 178). He described his wife's daily activities as including helping with the grandkids, light cleaning and laundry, paying bills, taking medications and resting, helping serve dinner, and computer research. *Id.* Mr. Villarreal stated his wife could no longer drive long distances, clean the house, mop floors, or work fulltime, and that she does not sleep well because she is unable to get comfortable due to pain. (AR 179). His wife needs assistance with dressing, bathing, hair care, and shaving due to limited movement and pain. She prepares sandwiches, canned soups, and leftovers, but cannot cook and prepare full course meals anymore. (AR 180). She can do some light cooking, light cleaning, and light laundry but needs help when she is in excessive pain (AR 180), and only drives short distances (AR 181). Mr. Villarreal stated his wife's hobbies include watching tv, reading, computer research, and walking for exercise, but that she cannot do these for extended periods like she used to (AR 182), and that she mainly stays home and does not socialize with friends (AR 183). His wife's conditions affect her ability to: lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, remember, and use her hands. (AR 183). She cannot lift more than 5 pounds, cannot reach her left shoulder above eye level, can walk for 10–15 minutes before needing a 10 minute rest, can sit for 30 minutes, needs assistance to climb stairs, and easily drops items when using either hand. (AR 183, 185). Mr. Villarreal stated his wife can pay attention for 15–20

minutes without distraction, does not handle stress well, does not handle changes in routine well and is very forgetful when changes occur, and no longer likes to socialize with her friends. (AR 183–84).

## H.  Vocational Evidence

At the hearing before the ALJ, Stacia Schonbrun testified as a vocational expert. She stated that Villarreal's past work as a sales representative was classified as light and semiskilled work. (AR 41). Her work as a case worker was defined as sedentary and semiskilled work. *Id*. Based on the hypothetical presented by the ALJ, Schonbrun testified that a person with Villarreal's restrictions could perform both the sales representative and case worker positions. (AR 42). When questioned by Villarreal's attorney whether someone who could not position their hand on a keyboard and could not position her neck in front of a monitor for an extended period of time could still perform office work, Schonbrun opined that "If she couldn't work on a computer more than occasionally, it would preclude the office work." (AR 42–43). Villarreal's attorney also asked whether Dr. Wu's RFC would preclude the sedentary jobs, and Schonbrun testified "Yes." (AR 43).

## I.  ALJ's Findings

The ALJ found that Villarreal had the following severe impairments: rheumatoid arthritis and status post left shoulder arthroscopic decompression. (AR 13). The ALJ further found that Villarreal's "depression did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and was therefore nonsevere." (AR 14).

The ALJ found that Villarreal's testimony regarding the intensity, persistence and limiting effects of her symptoms was not entirely credible because the medical evidence showed that her condition appeared to have improved, nor worsened, over time. (AR 16). The ALJ also noted that "[t]he claimant did not describe, and the record does not indicate, the type of side effects from her medications that would have prevented her from substantial gainful activity prior to the [DLI]." *Id*.

The ALJ gave little weight to Dr. Buck's opinion for three reasons:

> First, the opinion is dated August 2012, which is after the date last insured and there is no indication this treating clinician saw the claimant at any time prior to that date. Second, the opinion of this doctor appears on a fill-in-the-blank form, with only [sic] no treatment notes attached to it. The doctor failed to cite any medical testing results or objective observations to support her conclusions as to the claimant's residual functional capacity. Third, there are no treating notes that support the level of severity this doctor has assigned.

(AR 17). The ALJ also gave little weight to Dr. Wu's opinion because his opinion was dated well after the DLI and he did not indicate whether his assessment related to the period prior to the DLI. *Id*. She also noted his records were illegible.

The ALJ gave significant weight to the state agency medical consultant Dr. Hirsch's opinion "because it was based upon a thorough review of the evidence and familiarity with Social Security Rules and Regulations and legal standards." (AR 18). The ALJ also stated Dr. Hirsch's opinion was well supported by the medical evidence and not inconsistent with the other evidence in the record. *Id*.

The ALJ gave little weight to the third party statement submitted by Villarreal's husband because 1) his descriptions of Villarreal's activities were inconsistent; 2) he has a familial bias; 3) he has a direct pecuniary interest in the outcome of this case; 4) his assessment is inconsistent with the treating records; and 5) the form was completed after the DLI and Mr. Villarreal did not indicate whether his assessment relates to the period before that time. (AR 18).

The ALJ concluded Villarreal could perform work that required lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing and walking for 6 hours in an 8 hour work day, and sitting for 6 hours in an 8 hour work day. (AR 15). The ALJ limited Villarreal to occasionally pushing and pulling and reaching overhead with the upper left extremity. *Id*. At Step Four of the SSI/DIB evaluation process, the ALJ found Villarreal was able to perform her past relevant work as a sales representative and caseworker. (AR 18). The ALJ therefore concluded Villarreal was not disabled. *Id*

. . .

1    **III.    Standard of Review**

2         The Commissioner employs a five-step sequential process to evaluate SSI and

3    DIB claims. 20 C.F.R. §§ 404.920, 416.1520; *see also Heckler v. Campbell*, 461 U.S.

4    458, 460-462 (1983). To establish disability the claimant bears the burden of showing she

5    (1) is not working; (2) has a severe physical or mental impairment; (3) the impairment

6    meets or equals the requirements of a listed impairment; and (4) the claimant's RFC

7    precludes her from performing her past work. 20 C.F.R. §§ 404.920(a)(4),

8    416.1520(a)(4). At Step Five, the burden shifts to the Commissioner to show that the

9    claimant has the RFC to perform other work that exists in substantial numbers in the

10   national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007). If the

11   Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point

12   in the five-step process, he does not proceed to the next step. 20 C.F.R. §§ 404.920(a)(4),

13   416.1520(a)(4).

14        In this case, Villarreal was denied at Step Four of the evaluation process. Step

15   Four requires a determination of whether the claimant has sufficient RFC to perform past

16   work.  20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is defined as that which an individual

17   can still do despite his limitations. 20 C.F.R. §§ 404.1545, 416.945. An RFC finding is

18   based on the record as a whole, including all physical and mental limitations, whether

19   severe or not, and all symptoms. Social Security Ruling ("SSR") 96-8p. If the ALJ

20   concludes the claimant has the RFC to perform past work, the claim is denied. 20 C.F.R.

21   §§ 404.1520(f), 416.920(f).

22        The findings of the Commissioner are meant to be conclusive. 42 U.S.C. §§

23   405(g), 1383(c)(3). The court may overturn the decision to deny benefits only "when the

24   ALJ's findings are based on legal error or are not supported by substantial evidence in the

25   record as a whole." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). As set

26   forth in 42 U.S.C. § 405(g), "[t]he findings of the Secretary as to any fact, if supported by

27   substantial evidence, shall be conclusive." Substantial evidence "means such relevant

28   evidence as a reasonable mind might accept as adequate to support a conclusion,"

*Valentine*, 574 F.3d at 690 (internal quotation marks and citations omitted), and is "more than a mere scintilla, but less than a preponderance." *Aukland*, 257 F.3d at 1035. The Commissioner's decision, however, "cannot be affirmed simply by isolating a specific quantum of supporting evidence." *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998) (internal citations omitted). "Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Secretary's conclusion." *Aukland*, 257 F.3d at 1035 (internal quotations and citations omitted).

The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation, [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). This is so because "[t]he [ALJ] and not the reviewing court must resolve conflicts in evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (internal citations omitted).

Additionally, "[a] decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). The claimant bears the burden to prove any error is harmful. *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011) (*citing Shinseki v. Sanders*, 556 U.S. 396, 129 S.Ct. 1696, 1706 (2009)). An error is harmless where it is "inconsequential to the ultimate nondisability determination." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (internal citations omitted); *see also Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006). "[I]n each case [the court] look[s] at the record as a whole to determine whether the error alters the outcome of the case." *Molina*, 674 F.3d at 1115. In other words, "an error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error does not negate the validity of the ALJ's ultimate conclusion. *Id.* (internal quotation marks and citations omitted). Finally, "[a] claimant is not entitled to benefits under the statute unless the claimant is, in fact, disabled, no matter how egregious the ALJ's errors

may be." *Strauss v. Comm'r Soc. Sec.*, 635 F.3d 1135, 1138 (9th Cir. 2011).

## IV.   Analysis

Villarreal argues that the Commissioner erred in rejecting the treating physician and psychologist reports and failing to read their records, and in failing to incorporate all of Villarreal's assessed limitations into the RFC finding. Villarreal also argues that the ALJ erred in making her Step Four finding because the ALJ did not ask the VE whether her testimony was consistent with the DOT and because a conflict exists, and that the ALJ failed to make a Step Five finding. Villarreal further alleges that the ALJ failed to provide clear and convincing reasons for rejecting her subjective symptom testimony and the lay witness testimony. Villarreal asks the Court to remand this matter for an award of benefits without further administrative proceedings.

The Commissioner contends that Villarreal has not met her burden in proving disability during the relevant period of March 1, 2010 through September 30, 2010. Specifically, the Commissioner argues that Dr. Wu's treatment records do not support a finding of disability and that the other treating physician reports do not support the limitations assessed by Dr. Wu. The Commissioner also argues that the ALJ properly disregarded Dr. Buck's opinion because it does not relate back to the relevant period. The Commissioner further argues that the ALJ properly determined Villarreal was not fully credible and properly gave limited weight to Mr. Villarreal's Function Report, properly assessed all credible limitations in the RFC finding, and properly found Villarreal could perform her past relevant work. The Commissioner also states that the ALJ was not required to make a Step Five determination, and requests that if the Court finds error with the Commissioner's decision, that this matter be remanded for further administrative proceedings.

The undersigned recommends that the ALJ erred in finding that Villarreal could perform her past relevant work at Step Four of the sequential evaluation process. The Court further finds that the ALJ improperly gave reduced weight to Dr. Wu's opinion, that the ALJ erred in negatively assessing Villarreal's credibility and in rejecting the lay

witness testimony, and that the ALJ failed to incorporate all relevant limitations into the RFC assessment. These errors were not harmless, and the Court finds remand for an award of benefits is appropriate.

### A. Treating Physician Opinions

Villarreal alleges the ALJ erred by rejecting the medical opinions of her treating physicians in favor of the state agency consulting physician's opinion, and that the ALJ failed to read the treatment records of Drs. Wu and Buck. (Doc. 13 at 10).

The Ninth Circuit distinguishes between treating, examining, and nonexamining physicians, and as a general rule, more weight is usually accorded to the treating physician's opinion. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). The ALJ may reject a treating or examining physician's uncontradicted opinion only if he gives clear and convincing reasons for doing so. *Id*. at 830-31; *see also Weetman v. Sullivan*, 877 F.2d 20, 22 (9th Cir. 1989) (While the ALJ "is not bound by the uncontroverted opinions of the claimant's physicians on the ultimate issue of disability," he must still provide clear and convincing reasons for rejecting such opinions.) (internal quotations and citations omitted). If the treating or examining physician's opinion is contradicted by another doctor, the ALJ may reject that opinion only if he provides specific and legitimate reasons supported by substantial evidence in the record. *Lester*, 81 F.3d at 830-31. Further, "when evaluating conflicting medical opinions, an ALJ need not accept the opinion of a doctor if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). Finally, if the ALJ determines that the plaintiff's subjective complaints are not credible, this is a sufficient reason for discounting a physician's opinion that is based on those subjective complaints. *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009).

#### 1. Dr. Wu

The ALJ gave only limited weight to Dr. Wu's RFC assessment because his opinion was dated after the DLI and he did not indicate whether his assessment related to the period prior to the DLI. (AR 17). The ALJ also noted that Dr. Wu's records were

illegible, and thus she presumably did not read any of the treatment records for Villarreal's appointments with Dr. Wu. However, following the ALJ's decision, Villarreal submitted additional medical evidence to the Appeals Council, including transcribed copies of Dr. Wu's notes and a statement by Dr. Wu confirming that his RFC assessment did apply to the period of March 1, 2010 through September 30, 2010. Accordingly, the first two reasons relied upon by the ALJ for rejecting Dr. Wu's opinion have been mooted by this additional evidence.[3]

Further, "[i]n Social Security cases, the ALJ has a special duty to develop the record fully and fairly and to ensure that the claimant's interests are considered, even when the claimant is represented by counsel." *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001). However, the ALJ is only required to further develop a record if the evidence is consistent but the ALJ does not have sufficient evidence to determine whether a claimant is disabled, or if after weighing the evidence, the ALJ still cannot reach a conclusion as to disability. 20 C.F.R. § 404.1520b (2014); *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011) ("an ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence") (internal quotations and citation omitted). During the administrative hearing, "[t]he ALJ is not a mere umpire . . . it is incumbent upon the ALJ to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts. [She] must be especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003) (*quoting Higbee v. Sullivan*, 975 F.2d 558, 561 (9th Cir. 1992)).

While it is the claimant's burden to prove that she is disabled, *Valentine*, 574 F.3d at 689, the ALJ's duty to further develop the record arises in cases such as this one, where the record was inadequate to allow for proper evaluation of Villarreal's conditions and limitations. *See e.g. Garcia v. Comm. Soc. Sec.*, 768 F.3d 925, at 930 (9th Cir. 2014).

---

[3] Defendant concedes that the first two reasons the ALJ gave for negatively assessing Dr. Wu's opinion are no longer valid.

The ALJ's rejection of Dr. Wu's RFC assessment was based in part on the fact that she was unable to read his treatment notes and because it was unclear whether the RFC applied to the time period of March 1, 2010 through September 30, 2010. If the ALJ was uncertain about what time period the RFC assessment applied to, she could have requested additional clarifying information from Dr. Wu, as well as transcribed copies of his notes. While the claimant has since resolved this issue by submitting additional evidence, it was error for the ALJ to not undertake her duty to further develop the record.

Further, as was the case here, treatment records can play a role in the development of other evidence in the record. *See Garcia*, 768 F.3d at 931. For example, the state agency consulting physicians reviewed the available medical evidence and relied on that evidence in making their determinations about Villarreal's ability to work. "[T]he ALJ relied on these experts' findings in assessing [Villarreal's] RFC and ultimately in determining that [Villarreal] was not disabled." *Id*. at 933. Thus, not having transcribed copies of Dr. Wu's treatment notes likely influenced the conclusions reached by the consulting physicians as well as the ultimate disability determination made by the ALJ.

The ALJ also gave little weight to Dr. Wu's opinion because she concluded that the record did not support it. (AR 17). However, the ALJ did not point to specific evidence that she found contradicted or undermined Dr. Wu's opinion, and the medical record belies the ALJ's finding that the record does not support Dr. Wu's RFC assessment. Dr. Wu has been Villarreal's treating physician for a number of years, and she consistently reported pain in her neck, shoulder, and back to Dr. Wu during the period of March 1, 2010 through September 30, 2010. (AR 392, 554–55; 393, 556–57; 395, 559–60). Even before the relevant time period, Villarreal reported bilateral hand and arm pain (AR 283), lower back pain and left hip pain (289), left shoulder and lower back pain (382, 537–39; 390, 550–53), left shoulder pain (384, 540–41; 542–43), shoulder and knee pain (544–45; 548–49), and joint pain (243) to Dr. Wu. Villarreal also continued to report pain to Dr. Wu after her DLI in her shoulder, back, hands, and neck. (AR 396, 564–65; 566–67; 398, 568–69; 399, 570–71; 572–73; 402, 575–76; 577–78; 405–06;

408–09). These reports are consistent with the pain Villarreal reported to her other treating physicians during the period of March 1, 2010 through September 30, 2010,[4] as well as before the relevant period[5] and after the DLI.[6] Thus, the record is replete with numerous medical evaluations consistent with the limitations assessed by Dr. Wu. Accordingly, the undersigned finds that Villarreal consistently reported pain in her neck, shoulders, back, hands, feet and joints to Dr. Wu as well as to her other treating physicians, and that Dr. Wu's RFC assessment limiting Villarreal to standing for 2 hours or less, sitting for 15–30 minutes, never lifting or carrying 10 pounds, requiring breaks for her to lie down during the day and to alternate sitting and standing, and finding that she would miss more than 5 days of work per month, is consistent with the treatment records. (AR 485).

Further, while the ALJ found Villarreal's rheumatoid arthritis and status post left shoulder arthroscopic decompression were not of sufficient severity to meet or medically equal the criteria of a SS listed impairment (AR 15), even if Villarreal's conditions did not equal or meet a listing, it is clear that by crediting Dr. Wu's opinion and Villarreal's subjective symptom testimony,[7] Villarreal would not have the RFC to perform any work existing in the national economy.[8] *See Thomas*, 278 F.3d at 955 ("Even if the specific impairments described in the regulations do not apply, a claimant can make out a prima facie case of disability if she proves, in addition to the first two requirements, that she is

---

[4] Dr. Werner: shoulder and neck pain (AR 306, 307).

[5] Dr. Zamora: lower back pain (AR 507); Dr. Werner: left shoulder pain (AR 294, 295, 298, 303), neck pain (305); Dr. Mar: neck and shoulder pain (AR 296–97; 299; 300–01).

[6] Dr. Sanan: shoulder (AR 330), shoulder and neck (AR 333); Dr. Tok: upper and lower back and shoulder (339), left shoulder, feet, neck, and lower and middle back (337), left shoulder, neck, lower back, and feet (335), left shoulder, right hand, and feet (470), neck and shoulder (472), left shoulder, neck, whole body, fingers, and joints (474), neck and joints (476), left shoulder, hands, ankles, feet, and thighs (478); Dr. Nisbet: neck and shoulders (448), shoulders (453, 455, 457), right shoulder and spine (459).

[7] Addressed in section E below.

[8] When asked whether Dr. Wu's RFC would preclude sedentary jobs, VE testified "Yes." (AR 43).

not able to perform any work that she has done in the past."); *see also Benecke v. Barnhart*, 379 F.3d 587 (9th Cir. 2004) (ALJ found fibromyalgia was severe impairment but did not meet or equal criteria for listed impairment; on appeal Ninth Circuit found ALJ erred in discounting claimant's credibility and treating physician opinions, and remanded for award of benefits where evidence established claimant could not maintain employment).

In sum, it was legal error for the ALJ not to further develop the record to obtain transcribed copies of Dr. Wu's treatment notes and to determine what time period his RFC assessment applied to. In addition, the ALJ erred in assigning little weight to Dr. Wu's opinion and concluding, without elaborating, that the record did not support his opinion. The ALJ failed to give legitimate reasons for rejecting Dr. Wu's opinion regarding Villarreal's functional limitations, and the ALJ's reasons were not supported by substantial evidence in the record. Had Dr. Wu's opinion been properly credited, his RFC assessment would have established that Villarreal did not have the capacity to perform any gainful work activity. Accordingly, the undersigned recommends that the ALJ erred in failing to fully develop the record in regard to Dr. Wu's opinion and that she erred in assigning his opinion limited weight. This error was not harmless, and the undersigned finds remand for an award of benefits is appropriate.

2.     *Dr. Buck*

The ALJ also gave little weight to Dr. Buck's mental RFC assessment. The ALJ first noted that Dr. Buck's opinion was dated August 2012, which was after the DLI, and did not indicate whether Dr. Buck saw Villarreal at any time prior to that date. (AR 17). In the additional evidence submitted to the Appeals Counsel, Villarreal included treatment notes documenting appointments with Dr. Buck from February 2012 through May 2013. Thus these notes establish that Dr. Buck did begin her counseling sessions with Villarreal prior to her August 2012 RFC opinion. The ALJ also discounted Dr. Buck's opinion because it was on a fill-in-the-blank form and did not include any treatment notes. (AR 17). The submission of Dr. Buck's counseling notes resolves this

problem and provides evidence to support her opinion. Further, as noted above, the ALJ has a duty to develop the record and it was error here for the ALJ to fail to request Dr. Buck's treatment notes and then discount her opinion due to the lack of those notes.

However, the ALJ also discounted Dr. Buck's opinion because "[t]he doctor failed to cite any medical testing results or objective observations to support her conclusions as to the claimant's residual functional capacity" and because "there are no treating notes that support the level of severity this doctor has assigned." (AR 17). The Court finds these objections have not been cured by the submission of Dr. Buck's treatment notes because while the notes document that Villarreal had some problems with mood, energy, and memory, they do not reveal such a pervasive mental disorder so as to support Dr. Buck's opinion that Villarreal has no useful ability to function in a work setting due to her mental impairments. Dr. Buck also does not include any clinical testing results that would support her opinion of such severe limitations. More importantly though, Dr. Buck does not indicate that her mental RFC assessment applies to the period of March 1, 2010 to September 30, 2010, nor could it apply to that time period because Villarreal did not begin her sessions with Dr. Buck until February 2012, well after her DLI. Thus, Dr. Buck's opinion does not establish that Villarreal could not perform gainful work activity prior to her DLI due to mental limitations.

In sum, the undersigned recommends that the ALJ improperly rejected Dr. Buck's mental RFC assessment when she failed to further develop the record to determine when Dr. Buck began treating Villarreal and to obtain copies of the treatment notes. These issues have since been cured by the submission of additional evidence. However, the undersigned further finds that the ALJ properly gave Dr. Buck's opinion limited weight because there is no evidence to suggest that Dr. Buck's assessment applies to the relevant period of March 1, 2010 to September 30, 2010, and because the record does not support the severe functional limitations that Dr. Buck assessed.

### 3. *State Agency Physicians*

Finally, the ALJ gave significant weight to the opinion of state agency medical

consultant Dr. Hirsch "because it was based upon a thorough review of the evidence and familiarity with Social Security Rules and Regulations and legal standards." (AR 18). The ALJ also stated Dr. Hirsch's opinion was well supported by the medical evidence and not inconsistent with the other evidence in the record. *Id.*  While Dr. Hirsch assessed some limitations, he opined that Villarreal had significantly less physical restrictions than what Dr. Wu recommended. (AR 62–65). For example, while Dr. Wu opined that Villarreal could never lift and carry 10 pounds, Dr. Hirsch opined that Villarreal could frequently lift and carry 10 pounds and occasionally lift and carry 20 pounds. Dr. Hirsch also opined that Villarreal could stand and walk for 6 out of 8 hours in a typical work day, and sit for 6 out of 8 hours, while Dr. Wu opined that Villarreal could stand for less than 2 hours in an 8 hour work day, and sit for 15–30 minutes without needing to change position.

The undersigned finds that the ALJ erred in giving significant weight to Dr. Hirsch's opinion because, as noted above, the ALJ erred in assigning reduced weight to the opinion of Villarreal's treating physician, Dr. Wu, and in finding that Dr. Wu's assessed limitations were inconsistent with the record. Thus, if Dr. Wu's opinions are consistent with the record and with Villarreal's subjective symptom testimony,[9] the consulting physician opinion finding only mild limitations cannot also be consistent with the record. Further, the ALJ's overreliance on the consulting physician opinion ignores Villarreal's long-term treatment relationship with Dr. Wu in favor of a physician who has never treated nor examined her. *See Potter v. Colvin*, 2015 WL 1966715 at *14 (N.D. Cal. April 29, 2015).

### B. RFC Finding

Villarreal argues that the ALJ erred by failing to include all of her relevant impairments and limitations in the RFC determination. (Doc. 13 at 16). Specifically, Villarreal contends that the ALJ gave improper weight to Dr. Wu's opinion, which was supported by four treating orthopedic specialists and one rheumatologist, and to Dr.

---

[9] Discussed in Section E below.

1   Buck's opinion, and that by doing so, the ALJ failed "to address the full array of

2   Villarreal's documented symptoms." *Id*. at 17.

3       Residual functional capacity is "the most [a claimant] can still do despite [her]

4   limitations," and includes assessment of the claimant's "impairment(s), and any related

5   symptoms, such as pain, [which] may cause physical and mental limitations that affect

6   what [she] can do in a work setting." 20 C.F.R. § 404.1545(a)(1). In determining the

7   RFC, if the ALJ finds a claimant cannot do her past work, the ALJ may still find that a

8   claimant can adjust to other work if she can do any jobs that "exist in significant numbers

9   in the national economy." 20 C.F.R. § 404.1560(c)(1).

10      The Commissioner retains the ultimate responsibility for assessing a claimant's

11  RFC. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). The ALJ was required to assess

12  Villarreal's RFC based on all the record evidence, including medical sources,

13  examinations, and information provided by Villarreal. 20 C.F.R. §§ 404.1545(a)(1)-(3),

14  416.945(a)(1)-(3). However, the ALJ need not include all possible limitations in her

15  assessment of what a claimant can do, but rather is only required to ensure that the

16  residual functional capacity "contain[s] all the limitations that the ALJ found credible and

17  supported by the substantial evidence in the record." *Bayliss v. Barnhart*, 427 F.3d 1211,

18  1217 (9th Cir. 2005); *Greger v. Barnhart*, 464 F.3d 968, 973 (9th Cir. 2006) ("The ALJ,

19  though, 'is free to accept or reject restrictions in a hypothetical question that are not

20  supported by substantial evidence.'" (*quoting Osenbrock v. Apfel*, 240 F.3d 1157, 1164-

21  65 (9th Cir. 2001)).

22      Here, the ALJ made the following RFC assessment:

23          [T[]he claimant had the residual functional capacity to lift and
            carry 20 pounds occasionally and 10 pounds frequently, stand
24          and/or walk for 6 hours in an 8-hour workday and sit for 6
            hours in an 8-hour workday; push/pull with the left upper
25          extremity occasionally; occasionally climb ladders; frequently
            stoop and crawl; reach overhead with the left upper extremity
26          only occasionally; and avoid concentrated exposure to
            temperature extremes, heights and moving machinery.
27

28  (AR 15). Dr. Wu assessed significantly more limitations, finding that Villarreal had the

capacity to stand for 2 hours or less during an 8-hour workday, sit for 15–30 minutes without needing to change position, never lift and carry 10 pounds, occasionally reach and grasp, and frequently perform feeling/fingering/grasping. (AR 485). Dr. Wu further opined that Villarreal was required to lie down during the day and alternate sitting and standing every hour, and that she would miss more than 5 days work each month due to her physical conditions. Thus, in making her RFC assessment, the ALJ essentially disregarded all of Dr. Wu's recommendations regarding Villarreal's functional limitations.

While the ALJ discounted Dr. Wu's opinion in part because it was unclear whether it applied to the period of March 1, 2010 through September 30, 2010, Dr. Wu later confirmed that his assessment did apply to the relevant period. (AR 579). The ALJ also disregarded Dr. Wu's opinion because she was unable to decipher his medical records, an issue which has now been resolved with the submission of transcribed notes. Finally, the ALJ stated that Dr. Wu's opinion was not consistent with the medical record, but as discussed above, Dr. Wu's RFC finding reflects the pervasive and persistent pain that Villarreal has consistently reported to Dr. Wu and her other treating physicians.

Villarreal also contends that the ALJ erred in rejecting Dr. Buck's RFC assessment, but as noted above, Dr. Buck did not indicate that her assessment applied to the relevant period of March 1, 2010 through September 30, 2010, nor did Dr. Buck begin her counseling sessions with Villarreal until 2012. In addition, while there is some evidence in the record that Villarreal reported to Dr. Wu that she was anxious and depressed due to her ongoing physical problems,[10] there is insufficient documentation during the relevant period to support a finding of mental disability warranting the severe work-related restrictions that Dr. Buck assessed.

Accordingly, the undersigned recommends that the ALJ erred in making her RFC assessment because she failed to include the limitations assessed by Dr. Wu, which were

---

[10] Anxiety: April 14, 2010 (AR 393, 556–57); January 27, 2011 (AR 396, 564–65); April 8, 2011 (AR 398, 568–69); July 20, 2011 (AR 572–73); April 16, 2012 (AR 406); April 26, 2012 (AR 407). Depression: June 24, 2011 (AR 337).

also supported by the other treating physician opinions. The ALJ did not err in failing to incorporate the limitations assessed by Dr. Buck because Dr. Buck's opinion did not apply to the relevant period prior to Villarreal's DLI, and because the limitations assessed by Dr. Buck are not supported by substantial evidence in the record. The undersigned further finds that had the ALJ properly included the limitations assessed by Dr. Wu and presented those limitations in the hypothetical to the VE, the result would have been that Villarreal was precluded from even sedentary work.[11] In sum, the ALJ erred in determining Villarreal's RFC and this error was not harmless because it affected the ultimate disability determination.

### C.  Step Four Finding

Villarreal contends that the ALJ erred by failing to ask the VE whether her testimony was consistent with the DOT. (Doc. 13 at 18). Villarreal also argues that the ALJ erred in concluding that she could perform her past relevant work as a child resource specialist because the ALJ relied on the VE's faulty testimony that the caseworker position was sedentary work and did not consider Villarreal's detailed description of the exertional requirements of her job. *Id*. at 20.[12]

#### *1.    VE Testimony*

In determining the physical requirements of a claimant's past work, and whether she has the RFC to perform it, the ALJ considers the information provided by a claimant, as well as others who are familiar with her work, vocational experts and the DOT. 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2). In *Massachi v. Astrue*, 486 F.3d 1149 (9th Cir. 2007), the Ninth Circuit noted that SSR 00-4P affirmatively requires the ALJ to ask the VE whether her testimony is consistent with the DOT, and further requires a reasonable explanation for any apparent conflict. *Id*. at 1152-53; SSR 00–4p; *see also Cunningham*

---

[11] This is discussed more in the following section.

[12] In her opening brief Villarreal argued a third point, that the ALJ had erroneously found that Villarreal had past relevant work as a salesperson without any discussion of how this work constituted substantial gainful activity. In her reply brief Villarreal abandoned this argument, conceding that the work did constitute substantial gainful activity.

*v. Astrue*, 2011 WL 1119646 (D. Ariz. Mar. 28, 2011) (error requiring remand where the ALJ failed to ask the VE whether his testimony conflicted with the DOT and there were apparent inconsistencies between the DOT and the testimony). The ALJ's failure to inquire whether the VE's testimony is consistent with the DOT "could have been harmless, were there no conflict, or if the vocational expert had provided sufficient support for her conclusion so as to justify any potential conflicts." *Massachi*, 486 F.3d at 1154, n. 19. However, where there is an apparent conflict, the failure to inquire about and reconcile the conflict is not harmless. *See Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1004 (9th Cir. 2015); *Zavalin v. Colvin*, 778 F.3d 842, 846 (9th Cir. 2015) ("The ALJ's failure to resolve an apparent inconsistency may leave us with a gap in the record that precludes us from determining whether the ALJ's decision is supported by substantial evidence.").

Here, the ALJ did not ask the VE whether her testimony was consistent with the DOT, and if not, whether there was a reasonable explanation for the conflict. The undersigned finds that there was in fact a conflict because the VE testified that Villarreal could perform her PRW as a caseworker, which the VE defined as sedentary, but the hypothetical posed by the ALJ included more than sedentary requirements. Pursuant to C.F.R. § 404.1567(a),

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

In her hypothetical to the VE, the ALJ stated the person could "lift and carry 20 pounds occasionally" and "stand and/or walk for 6 hours in an 8-hour workday." (AR 15). Thus, the hypothetical includes lifting requirements and standing/walking requirements that exceed the scope of sedentary work. Accordingly, the undersigned finds that the ALJ's failure to ask the VE whether her testimony was consistent with the DOT, and to solicit a reasonable explanation for the conflict, was not harmless error because the VE's

recommendation that Villarreal could perform her PRW as a caseworker was not consistent with the DOT where the hypothetical posed by the ALJ included work requirements that exceed the limitations of sedentary work.

## 2.      *Child Welfare Resource Specialist*

Villarreal also argues that the ALJ's Step Four finding is "flawed because it is based on erroneous assumptions about the nature of Villarreal's past work as a child welfare resource specialist." (Doc. 13 at 20). Villarreal contends that while the VE classified this work as a sedentary caseworker position, the information Villarreal provided about the work that she actually performed includes non-sedentary activities such as conducting home visits, intervening in parenting situations, monitoring parent-child visits, travel, transporting children from foster care to visit locations, and lifting and carrying children up to 50 pounds. *Id*. at 20–21 (*citing* AR 188).

"The claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work." SSR 82–62. Here, it is clear that Villarreal's description of the demands of her work as a child welfare resource specialist exceed the limitations of sedentary work. Further, as noted above, the hypothetical posed by the ALJ also exceeded the limitations of sedentary work.

Villarreal also points out that "the only caseworker position categorized as sedentary and with a Specific Vocational Preparation ("SVP") rating of five in the DOT, as the VE categorized Villarreal's past work (AR 41), refers [] to someone who performs research in the office of a member of Congress." (Doc. 13 at 19 n. 10) (*citing* DOT § 169.262-010). Villarreal further notes that while the DOT does include "a child welfare caseworker position that is classified as light and skilled with an SVP 7, [] neither the VE nor the ALJ made any mention of this." (Doc. 13 at 21 n. 13) (*citing* DOT § 195.107-014). The undersigned notes that even if the VE had classified Villarreal's work as a child welfare resource specialist as light work in accordance with DOT § 195.107-014, Villarreal's statement that her work required her to lift and carry children up to 50 pounds

shows that her work as actually performed also exceeds the scope of light work.[13]

In sum, the undersigned finds that the ALJ erred in making her Step Four finding for two reasons. First, the ALJ erred by failing to ask the VE whether her testimony was consistent with the DOT and by not soliciting an explanation for any apparent conflict. This error was not harmless because the VE's testimony that Villarreal could perform her PRW as a caseworker was not consistent with the DOT where the hypothetical posed by the ALJ included work requirements that exceeded sedentary work. Second, the ALJ erred in finding that Villarreal could perform her PRW as a child welfare resource specialist where the ALJ relied on the VE's testimony that the caseworker position was sedentary work and did not consider Villarreal's description of the exertional requirements of her job. This error was not harmless because Villarreal's testimony that she had to lift and carry children weighing up to 50 pounds exceeds the scope of both light and sedentary work.

The undersigned further finds that the ALJ's Step Four finding that Villarreal could perform her PRW as a caseworker and a sales representative is error because, if the ALJ had properly credited Dr. Wu's opinion and included the limitations he assessed in the hypothetical to the VE, Villarreal would be precluded from all PRW. (*See* AR 43) (When asked whether Dr. Wu's RFC would preclude sedentary work, the VE testified "Yes"). Accordingly, the undersigned recommends that this matter be remanded for an award of benefits.

### D.  Step Five Finding

Villarreal contends that the ALJ erred in failing to make a Step Five finding. (Doc. 13 at 21). However, pursuant to SS regulations, if the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, she does not proceed to the next step. 20 C.F.R. §§ 404.920(a)(4), 416.1520(a)(4). Thus, because in the present matter the ALJ determined Villarreal was not disabled at Step Four of the

---

[13] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." C.F.R. § 404.1567(b).

1    sequential evaluation process, the ALJ was not required to make a Step Five finding.[14]

2            E.  Credibility Determination

3            Villarreal argues that the ALJ improperly rejected her subjective symptom

4    testimony without providing clear and convincing reasons for doing so, and misconstrued

5    the lay witness statement of Villarreal's husband. (Doc. 13 at 22).

6            "An ALJ's assessment of symptom severity and claimant credibility is entitled to

7    great weight." *Honaker v. Colvin*, 2015 WL 262972, *3 (C.D. Cal. Jan. 21, 2015)

8    (internal quotations and citations omitted). This is because "an ALJ cannot be required to

9    believe every allegation of disabling pain, or else disability benefits would be available

10   for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Treicherler v.*

11   *Comm. Soc. Sec. Admin.*, 775 F.3d 1090, 1106 (9th Cir. 2014) (citation omitted). "If the

12   ALJ's credibility finding is supported by substantial evidence in the record, the reviewing

13   court may not engage in second-guessing." *Honaker*, 2015 WL 262972 at * 3 (internal

14   quotations and citation omitted).

15           While questions of credibility are functions solely for the ALJ, this Court "cannot

16   affirm such a determination unless it is supported by specific findings and reasoning."

17   *Robbins v. Comm'r Soc. Sec. Admin.* 466 F.3d 880, 885 (9th Cir. 2006). "To determine

18   whether a claimant's testimony regarding subjective pain or symptoms is credible, an

19   ALJ must engage in a two-step analysis." *Lingenfelter*, 504 F.3d at 1035-36. "First, the

20   ALJ must determine whether the claimant has presented objective medical evidence of an

21   underlying impairment 'which could reasonably be expected to produce the pain or other

22   symptoms alleged.'" *Id*. at 1036 (*quoting Bunnell v. Sullivan*, 947 F. 2d 341, 344 (9th Cir.

23   1991)). "Second, if the claimant meets this first test and there is no evidence of

24   malingering, 'the ALJ can reject the claimant's testimony about the severity of the

25

26           [14] While the ALJ did not make a Step Five finding as to whether Villarreal could
     perform other work existing in the national economy, this does not affect the
27   undersigned's recommendation to remand for an award of benefits. Based on the
     testimony of the VE, if the ALJ had credited Villarreal's subjective symptom testimony
28   and Dr. Wu's RFC assessment, then Villarreal would be precluded from even sedentary
     work.

symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (*quoting Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)).

While it is permissible for an ALJ to look to the objective medical evidence as one factor in determining credibility, the ALJ's adverse credibility finding must be supported by other permissible evidence in the record. *Bunnell*, 947 F.2d at 346-47 ("adjudicator may not discredit a claimant's testimony of pain and deny disability benefits solely because the degree of pain alleged by the claimant is not supported by objective medical evidence"). However, "an ALJ may reject a claimant's statements about the severity of his symptoms and how they affect him if those statements are inconsistent with or contradicted by the objective medical evidence." *Robbins*, 466 F.3d at 887 (emphasis in original).

"Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (internal quotations and citations omitted).

Here, the ALJ determined that Villarreal's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (AR 16). The ALJ did not make a finding that Villarreal was malingering; therefore, to support her discounting of Villarreal's assertions regarding the severity of her symptoms, the ALJ had to provide clear and convincing, specific reasons.

### 1.  *Claimant's Testimony*

The ALJ found that Villarreal's testimony regarding the intensity, persistence and limiting effects of her symptoms was not entirely credible because the medical evidence showed that her condition appeared to have improved, nor worsened, over time. (AR 16). The ALJ also noted that Villarreal "did not describe, and the record does not indicate, the type of side effects from her medications that would have prevented her from substantial

gainful activity prior to the [DLI]." *Id.* The ALJ therefore concluded that Villarreal's allegations were not credible to establish a more restrictive RFC than the RFC assessed by the ALJ. (AR 17). For example, the ALJ noted that although Villarreal "had minor shoulder surgery in 2009 and some continued symptoms thereafter, there is no evidence of radiculopathy." (AR 16). The ALJ also noted that a MRI in November 2010 showed "only minimal tendinopathy and mild subacromial impingement of the left shoulder," and that "[n]erve conduction studies around that same time were normal." *Id.* The ALJ also found that there was "no evidence of back pain or problems between the amended alleged onset date and the [DLI]. Although after the [DLA], X-rays of the lumbar spine indicated no acute abnormalities and minor degenerative changes." (AR 16). The ALJ further noted that Villarreal's rheumatoid arthritis was not diagnosed until 2011,[15] but that even if she had the disorder prior to her DLI, "there is an absence of evidence of severe fatigue, fever, and malaise or weight loss during that time that would have interfered with her ability to engage in substantial gainful activity." (AR 16–17).

While the ALJ cited the above medical findings as a reason for discounting Villarreal's credibility, the ALJ overlooks the significance of the fact that Villarreal has consistently complained of diffuse pain affecting many parts of her body.[16] The ALJ also

---

[15] Dr. Wu assessed arthritis on February 25, 2009 (AR 382, 537–39), and Villarreal told Dr. Zamora that she had been diagnosed with rheumatoid arthritis in 2006 or 2007 (AR 513). Dr. Wu assessed rheumatoid arthritis on April 8, 2011. (AR 568).

[16] Villarreal consistently reported pain in her neck, shoulder, and back to Dr. Wu during the period of March 1, 2010 through September 30, 2010. (AR 392, 554–55; 393, 556–57; 395, 559–60). Prior to March 1, 2010, Villarreal reported bilateral hand and arm pain (AR 283), lower back pain and left hip pain (289), left shoulder and lower back pain (382, 537–39; 390, 550–53), left shoulder pain (384, 540–41; 542–43), shoulder and knee pain (544–45; 548–49), and joint pain (243) to Dr. Wu. Villarreal also continued to report pain to Dr. Wu after her DLI in her shoulder, back, hands, and neck. (AR 396, 564–65; 566–67; 398, 568–69; 399, 570–71; 572–73; 402, 575–76; 577–78; 405–06; 408–09).

In addition to her appointments with Dr. Wu, Villarreal also reported shoulder and neck pain to Dr. Werner during the relevant time period, (AR 306, 307); reported pain to multiple doctors prior to March 2010 (Dr. Zamora: lower back pain (AR 507); Dr. Werner: left shoulder pain (AR 294, 295, 298, 303), neck pain (305); Dr. Mar: neck and shoulder pain (296–97; 299; 300–01)); and continued to reported pain after the DLI (Dr. Sanan: shoulder (AR 330), shoulder and neck (AR 333); Dr. Tok: upper and lower back and shoulder (339), left shoulder, feet, neck, and lower and middle back (337), left shoulder, neck, lower back, and feet (335), left shoulder, right hand, and feet (470), neck

1  ignores the treatments notes from Villarreal's doctors and PT providers indicating that

2  while Villarreal experienced some relief from medications and PT, she continued to

3  experience ongoing pain[17] and ultimately made little progress with PT.[18] Though the ALJ

4  alleges Villarreal's condition improved over time, she fails to point to any specific notes

5  by the treating physicians indicating improvement, nor is there any indication in the

6  record that Villarreal's condition had improved to the point where she would be able to

7  sustain full-time employment. *See Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989)

8  (the fact that a claimant is "responding to treatment ... does not provide a clear and

9  convincing reason for disregarding" her testimony because "[n]o physician opined that

10  any improvement would allow [her] to return to work."). While there are instances in the

11  record where Villarreal reported her pain was improved or a medication was helping,

12

13  and shoulder (472), left shoulder, neck, whole body, fingers, and joints (474), neck and
   joints (476), left shoulder, hands, ankles, feet, and thighs (478); Dr. Nisbet: neck and
   shoulders (448), shoulders (453, 455, 457), right shoulder and spine (459)).

14

15  [17] On September 30, 2009 Dr. Wu noted Villarreal's shoulder was somewhat
   better. (AR 550). On October 13, 2009 Dr. Wegner noted her shoulder did not get any
16  better with PT and that she had 50% temporary pain relief after an injection. (AR 295).
   On November 4, 2009 Dr. Wegner noted Villarreal had 50% pain relief in her shoulder
17  after an injection, and had some improvement with cervical spine therapy. (AR 298). On
   November 23, 2009 Dr. Mar noted recurrence and worsening of symptoms after PT. (AR
18  299). On December 29, 2009 Dr. Wegner noted Villarreal's shoulder pain was partially
   relieved by surgery. (AR 304). However, on March 8, 2010 Dr. Wegner noted "[s]he is
19  not doing much better and, in fact, she has probably slid back a little bit." (AR 306). On
   June 4, 2010 Dr. Wegner noted PT was not really making a difference. (AR 307). On
20  June 7, 2010 Dr. Wu noted Villarreal's shoulder was not improved after surgery. (AR
   559). On June 24, 2011 Dr. Tok noted relief from excruciating pain with Methotrexate
21  but still had pain (AR 337), and on September 26, 2011 Dr. Tok noted improved pain and
   mobility with Methotrexate but still pain (AR 335). On May 10, 2012 Dr. Nisbet noted
22  relief after an injection (AR 452). On July 9, 2012 Dr. Nisbet noted an injection improved
   shoulder motion and pain control but that some pain had returned. (AR 453). On August
23  20, 2012 Dr. Nisbet noted significant improvement in left shoulder pain but that
   Villarreal still had episodic pain. (AR 455). On September 28, 2012 Dr. Nisbet noted
24  increased shoulder pain (AR 457), and on November 26, 2012 Dr. Nisbet noted new pain
   in the right shoulder and spine pain, and that an injection in the left shoulder helped but
25  wore off after a few weeks (AR 459–60).

26  [18] A discharge report dated December 14, 2009 notes that Villarreal was not
   progressing with her shoulder and continued to have severe pain. (AR 259). A progress
27  report from April 7, 2010 notes that "progress continues to be limited due to severe
   involuntary spasming" and that Villarreal's high doses of anti-inflammatories and pain
28  medications were minimally helping. (AR 275). A discharge report from October 1, 2010
   states that Villarreal continued to have pain with range of motion, and had muscle spasms
   that disallowed movement. (AR 267).

"[a]t most, this evidence demonstrates that, for a brief period of time, [Villarreal] experienced some relief from [her] pain." *Lester*, 81 F.3d at 833. Moreover, "it is error to reject a claimant's testimony merely because symptoms wax and wane." *Garrison*, 759 F.3d at 1017.

Further, while Villarreal's November 2, 2010 nerve conduction study was normal (AR 321), Dr. Nisbet noted that "thoracic outlet rarely shows up on an EMG/nerve conduction study and may still be present." (AR 451). Normal findings on examination are not inconsistent with Villarreal's diagnoses, especially given her consistent reports of pain, fatigue, and sleep disturbance, and the ALJ's "[s]heer disbelief is no substitute for substantial evidence." *Benecke*, 379 F.3d at 594. In addition, the ALJ incorrectly found that there was "no evidence of back pain or problems between the amended alleged onset date and the [DLI]." (AR 16). In fact, Villarreal reported back pain to Dr. Wu on two occasions between March 1, 2010 and September 30, 2010. (AR 392, 544–55; 395, 559–60). Finally, the ALJ found that even if Villarreal had been diagnosed with rheumatoid arthritis prior to the DLI, there was "an absence of evidence of severe fatigue, fever, and malaise or weight loss during that time that would have interfered with her ability to engage in substantial gainful activity." (AR 16–17). However, in his Addendum to Medical Source Statement, Dr. Wu specifically stated that during the period of March 1, 2010 to September 30, 2010, Villarreal experienced severe fatigue and malaise. (AR 579).

In sum, the undersigned finds that the ALJ failed to articulate clear and convincing reasons for rejecting Villarreal's subjective symptom testimony, and that the ALJ improperly isolated specific portions of the medical evidence and failed to consider the record as a whole in erroneously determining that Villarreal's condition had improved over time. *See Hydorn v. Colvin*, 2014 WL 3819352, *9 (D. Ariz. Aug. 4, 2014) ("The ALJ must consider the record as a whole and not isolate evidence that detracted from a finding of disability.").

. . .

2.     *Lay Testimony*

The ALJ's credibility finding was also based in part on her consideration of the Function Report completed by Villarreal's husband and her determination that Villarreal's activities of daily living showed that her condition had improved, not worsened, over time. (AR 16). The ALJ stated that the Function Report depicted Villarreal as:

> [S]omeone who could help with the grandchildren, review the household budget, pay the bills, do light housekeeping and the laundry, watch television, pick-up the grandchildren, help serve dinner, help the grandchildren with their homework and do computer research. She was able to prepare simple meals on a daily basis. She was able to drive a car in November 2011 and shop in stores and by computer. In addition to paying bills, the claimant handled the savings account and used the checkbook or money orders. She enjoyed watching television, reading, doing computer research and walking for exercise as well as spending time with her family. The husband also said she could finish what she started and was able to follow both written and spoken instructions.

(AR 16) (internal citations omitted).

However, the ALJ's summation of Villarreal's activities of daily living both misconstrues Mr. Villarreal's Function Report and ignores Villarreal's own testimony regarding these activities. In contrast to the ALJ's finding that Villarreal could drive a car and shop in stores, Mr. Villarreal stated that his wife drove short distances but could no longer drive long distances (AR 179, 181) and that she shopped for groceries 2–3 times per month for 30–45 minutes (AR 181). Villarreal testified that she hardly drove in 2010 (AR 32), and noted on her Function Reports that she could not drive for extended periods (AR 169, 212) and that she only drove short distances to pick up her grandchildren at school (AR 172–173). Similarly, while the ALJ found that Villarreal could do light housekeeping and laundry, Mr. Villarreal stated that his wife could no longer clean the house or mop floors (AR 179) and that she did some laundry and light cleaning but needed help when she was in excessive pain (AR 180). Villarreal testified that she did very minimal household chores in 2010 (AR 30), and noted on her Function Report that she did light cleaning such as washing a few dishes, dusting, and wiping the counters

(AR 172), but could not clean the whole house or make the beds (AR 176). The ALJ also noted that Villarreal could prepare simple meals on a daily basis. Villarreal and her husband both reported that she could not cook full course meals that require long preparation, but that she could heat leftovers and prepare sandwiches and canned soups. (AR 171, 180). The ALJ also failed to note Villarreal's testimony that she needed assistance with dressing and bathing herself. (AR 29, 171, 179, 211).

"[D]aily activities may be grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferrable to a work setting.'" *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (*quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)); *Molina*, 674 F.3d at 1112-13 (Activities of daily living "may be grounds for discrediting the claimant's testimony to the extent that they contradict the claims of a totally debilitating impairment."). "The ALJ must make 'specific findings relating to [the daily] activities' and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination." *Id*. (*quoting Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005)). However, "the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001).

"ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain and other symptoms because impairments that would unquestionably preclude work will often be consistent with doing more than merely resting in bed all day." *Garrison*, 2014 WL 3397218 at *17. "'Many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication.'" *Id*. (*quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). "Recognizing that 'disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations,' we have held that '[o]nly if [her] level of activity were inconsistent with [a claimant's] claimed limitations

would these activities have any bearing on [her] credibility.'" *Id.* (*quoting Reddick v. Chater*, 157 F.3d at 722). "'The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.'" *Id.* (*quoting Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)).

"Here, there is neither evidence to support that [Villarreal's] activities were 'transferrable' to a work setting nor proof that [Villarreal] spent a 'substantial' part of h[er] day engaged in transferrable skills." *Orn*, 495 F.3d at 639. Villarreal's daily activities of simple meal preparation, light housekeeping, driving short distances, and helping with her grandchildren "are so undemanding that they cannot be said to bear a meaningful relationship to the activities of the workplace," especially when taking into consideration her frequent breaks throughout the day to rest. *Id.*; *see also Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014) (claimant's "daily activities, as she described them in her testimony, were consistent with her statements about the impairments caused by her pain … [and are] also consistent with an inability to function in a workplace environment.").

Had the ALJ credited Villarreal's and her husband's testimony regarding her pain and limited daily activities, including Villarreal's testimony that she has pain throughout the day, must take frequent breaks to rest during the day because of the pain, and must frequently change positions when sitting and standing, the resulting RFC would likely have been different. According to the VE's testimony, had the ALJ included limitations of alternating sitting and standing every hour and taking breaks to lay down throughout the work day, it would result in a finding that even sedentary work was precluded, and thus an ultimate determination that Villarreal was disabled. (AR 43).

Accordingly, the undersigned recommends that the ALJ erred in discounting

Villarreal's credibility regarding the severity of her pain and the functional consequences of her conditions. Further, this error was not harmless. Had the ALJ properly considered Villarreal's subjective complaints of pain and the testimony regarding her activities of daily living, it would have also impacted the ALJ's assessment of the medical evidence, the RFC finding, and the hypothetical posed to the VE. Thus, this error was harmful because it affected the ultimate nondisability determination. *See Molina*, 674 F.3d at 1115.

## V.   Remedy

A federal court may affirm, modify, reverse, or remand a social security case. 42 U.S.C. § 405(g). Absent legal error or a lack of substantial evidence supporting the ALJ's findings, this Court is required to affirm the ALJ's decision. After considering the record as a whole, this Court simply determines whether there is substantial evidence for a reasonable trier of fact to accept as adequate to support the ALJ's decision. *Valentine*, 574 F.3d at 690.

"'[T]he decision whether to remand the case for additional evidence or simply to award benefits is within the discretion of the court.'" *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir.1989) (*quoting Stone v. Heckler*, 761 F.2d 530, 533 (9th Cir. 1985)). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke*, 379 F.3d at 593. Conversely, remand for an award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Id*. (citations omitted). Where the test is met, "we will not remand solely to allow the ALJ to make specific findings . . . Rather, we take the relevant testimony to be established as true and remand for an award of benefits." *Id*. (citations omitted); *see also Lester*, 81 F.3d at 834.

Here, the undersigned finds that remanding for an award of benefits is appropriate. The ALJ erred in finding that Villarreal's activities of daily living were inconsistent with her testimony regarding her pain-related impairments and in negatively assessing her credibility, and failed to provide legally sufficient reasons for these findings. The ALJ further erred in giving little weight to the opinion of Dr. Wu, and in giving significant weight to the opinion of the non-examining state agency physician. "Because the ALJ failed to provide legally sufficient reason's for rejecting [Villarreal's] testimony and her treating physician opinions, we credit the evidence as true." *Benecke*, 379 F.3d at 594. The undersigned further finds that no outstanding issues must be resolved and that "it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence is credited," because based on the limitations assessed by Dr. Wu and the testimony of the VE, it is clear that all work is precluded. *Id*. Thus, the Commissioner's ultimate decision to deny Villarreal benefits is not supported by substantial evidence in the record and constitutes harmful error, and remand for an award of benefits is appropriate.

## VI.   Recommendation

For the foregoing reasons, the Magistrate Judge recommends that the District Court, after its independent review, enter an order remanding this matter for an award of benefits.

Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections within fourteen days after being served with a copy of this Report and Recommendation. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Fed.R.Civ.P. 72(b). No reply to any response shall be filed. *See id*. If objections are not timely filed, then the parties' rights to de novo review by the District Court may be deemed waived. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

. . .

. . .

Dated this 14th day of January, 2016.

Eric J. Markovich
United States Magistrate Judge